Maria Elena MARTINEZ, Individually and as Personal Representative of the Estate of Santos Roque Rocha, Plaintiff,

v.

E.I. DuPONT DE NEMOURS AND COMPANY, INC., Defendant.

C.A. No. N10C–04–209–ASB.

Superior Court of Delaware, New Castle County.

Submitted: Oct. 1, 2012.
Decided: Dec. 5, 2012.

Thomas C. Crumplar, Esquire, and Robert Jacobs, Esquire, Jacobs & Crumplar, P.A., Wilmington, Delaware, Attorneys for the Plaintiff.

John C. Phillips, Esquire, and David A. Bilson, Esquire, Phillips, Goldman & Spence, P.A., Wilmington, Delaware, Attorneys for the Defendant.

ABLEMAN, Judge.

## I. *Introduction*

This case is one in a series of approximately twenty-five cases filed against defendant E.I. DuPont de Nemours and Company, Inc. ("DuPont") by Argentine nationals who allege that they were exposed to asbestos while working in textile plants located in Berazategui, Argentina and Mercedes, Argentina. At the time of the alleged exposures, which began in the early 1960's, the plants were owned by DuPont Argentina Sociedad Anomina ("DASA"). DASA, now known as DASRL, has its principal place of business in Argentina, and is a great-great grand-subsidiary of DuPont.[1]

Multiple layers of ownership separate DASRL from DuPont. The majority owner of DASRL is DuPont de Nemours Investments, a wholly-owned subsidiary of DuPont Poland B.V., which, in turn, is a wholly-owned subsidiary of DuPont Textiles & Interiors Delaware, Inc., a wholly-owned subsidiary of the sole defendant in these cases, DuPont. DASRL has never conducted business in the United States, is incorporated under the laws of Argentina, and has its principal place of business in Buenos Aires, Argentina.

All of the claims in the twenty-five or more cases filed by the Jacobs & Crumplar law firm allegedly arose from work that Plaintiffs or their Argentine family members performed in Argentina for their Argentine employers. All injured Plaintiffs or Plaintiffs' decedents were diagnosed in Argentina and treated in Argentina.

Plaintiff in this case, Maria Elena Martinez, is the wife of a now deceased Argentine textile plant worker, Santos Roque Rocha ("Rocha"). Plaintiff claims that her husband suffered injuries from his exposure to asbestos while employed by DASRL, in Berazategui, Argentina. She has named DuPont as the sole defendant in this case and it is the only entity from which she seeks damages.

The *Martinez* case is one of the later-filed actions. It differs from the other cases in only two respects. First, Plaintiff in the case at bar alleges asbestos exposures related to a different manufacturing facility from the other cases. Mr. Rocha was employed at a plant in Berazategui rather than at DASRL's plant in Mercedes, Argentina, where the other cases allege exposure. Secondly, *Martinez* is unlike the other lawsuits because Plaintiff seeks to separate herself from these other Argentine plaintiffs that preceded her by claiming she is not trying to pierce the corporate veil of DASRL's parent corporation, a cause of action over which this Court lacks jurisdiction. Instead, Martinez has added a new theory of liability, the "direct participant" theory, which was not pled in the other actions.

In prior motions to dismiss some of these Argentine "test" cases, DuPont argued that if non-U.S. citizen foreign national workers were allowed to proceed against a U.S. grandparent corporation, rather than the properly incorporated and capitalized foreign subsidiary by whom they are or were directly employed, the structure and limited liability of the separate incorporated legal entity would be impermissibly disregarded. In essence, DuPont contended that the claims by

---

1. DASA has since been reorganized as Du-Pont Argentina Sociedad de Responsabilidad Limitada ("DASRL"). To avoid confusion, the Court will use the designation DASRL to refer to the Argentine entity.

Plaintiffs in these cases amount impermissibly to veil-piercing, over which the Superior Court has no jurisdiction. All of the motions to dismiss are based primarily upon the contention that the separate legal identity, which is the essence of incorporation and limited liability, cannot be impermissibly disregarded in this or any of the other Argentine cases.

This new "direct participant" theory of liability, pled only in the *Martinez* case, in addition to all of the other various claims and theories of liability, renders this particular case the most viable "test" case. The *Martinez* Complaint is the action in which Plaintiff has best been able to flesh out the various theories of liability. Accordingly, if the *Martinez* case cannot survive a motion to dismiss, the remaining cases will likely be subject to dismissal as well, since they assert all but one of the theories presented herein. This Opinion is rendered with the expectation that it will have application to the other similar cases filed by Argentine nationals.

## II. *Factual and Procedural Background*

### A. *History*

Plaintiff's decedent, Santos Rocha, was employed at the DASRL textile plant in Berazategui, Argentina from 1963 until 1980. He died of mesothelioma on August 1, 2009, twenty-nine years after he ceased employment with DASRL. His wife, Maria Martinez, was appointed as administrator of his estate (the "Rocha Estate") by an Argentine court approximately a year after his death, on June 3, 2010. DASRL records confirm that Rocha was employed by DASRL, not DuPont, at the Berazategui plant.[2] He was never employed by DuPont.

During the years that Rocha was employed at the Berazategui Plant, the exclusive owner of the facility was DASRL.[3] DASRL was a validly existing corporation, in good standing, organized under the laws of Argentina. DASRL's principle place of business is in Buenos Aires, Argentina. It conducts no business in the United States and has no offices in the United States. It has never filed a lawsuit in the United States nor has it ever been sued here. DuPont indirectly owns DASRL, in that it is its corporate great-great grandparent.[4] In 2004, DASRL sold the majority of the Berazategui Plant to Invista Argentina Sociedad de Responsabilidad Limitada.

Neither Rocha nor the Administrator of his Estate has initiated any civil claims in Argentina against DASRL in connection with Rocha's asbestos-related occupational injury and death. Under Argentine law, an employee or his estate is required to notify the employer of the illness or injury and make a demand for compensation before initiating a civil suit for damages.[5] Neither Rocha nor his estate has provided

---

**2.** Declaration of Monica B. Fernandez ("Fernandez Decl.") ¶ 5.

**3.** Until December 14, 2009, DASRL was a sociedad anomina and was known as DuPont Argentina Sociedad Anomina. The Complaint refers to "DuPont Argentina SA" presumably referring to what is now known as DASRL. DASRL was referred to as "DASA" in DuPont's Motions to Dismiss the "test cases."

**4.** DASRL is owned by DuPont de Nemours Investments (DNIS) which has a 95 percent interest in the company. DuPont International B.V. holds the remaining 5 percent interest. DNIS is wholly owned by DuPont International B.V., which in turn is owned by DuPont Textiles & Interiors Delaware, Inc. ("DTI–DE"). Since DuPont owns DTI–DE, it is therefore technically the great-great grandparent of DASRL.

**5.** Declaration of Dr. Ricardo Foglia ("Foglia Decl") ¶¶ 65–67.

this notification nor has there been a demand for compensation in connection with his asbestos exposure.[6] A civil mediation before a court-appointed mediator, which is a necessary prerequisite under Argentina law before filing a civil suit, has also not been initiated.[7]

### B. *The Complaint*

The Complaint in this case was filed on April 23, 2010. It alleges six separate counts against DuPont, one of which is actually a statement of facts rather than a claim for relief. Count I, which is contained only in this (the *Martinez*) case, asserts a direct liability claim against DuPont "due to its own separate and distinct tortious conduct." This count essentially alleges that DuPont was responsible for the safety procedures and regulations that existed at the Berazategui plant, and that it either directly or indirectly caused workers there to use asbestos, without adequately warning them of its hazards and without providing protection from exposures. Specifically, Martinez asserts that DuPont "provided raw asbestos ... or contributed funds to purchase raw asbestos that was used" by DASRL at the plant. The Complaint also states that DuPont "provided management, engineering, and safety services to [DASRL] in a negligent manner," causing injury to Rocha. DuPont is alleged to have "directed and/or controlled the use of asbestos at the ... Berazategui plant" either by direct employee interaction or through rules and regulations. Plaintiff also claims that DuPont trained DASRL (then DASA) management, staff, and employees in "unsafe ways" and "failed to provide proper training for the safe use and handling of asbestos." Martinez further asserts that DuPont can be held liable for conducting

health, safety, and occupational hygiene audits, and for monitoring production and safety procedures at the Argentine plants.

The allegations that are set forth in Count I reappear elsewhere throughout the Complaint. For example, in Count IV, which is the negligence count, Martinez asserts that DuPont failed to exercise ordinary care and caution for the safety of Rocha by: 1) requiring him to work with and around asbestos fibers in an unsafe manner; 2) failing to advise and/or warn workers of practices that would reduce the risk of inhaling, ingesting, or otherwise absorbing asbestos fibers; 3) failing to provide adequate warnings of the unreasonable risks of exposure to asbestos to those likely to come into contact with asbestos fibers at DASRL's plants; 4) failing to provide adequate safety equipment designed to limit Rocha's exposure to asbestos; and 5) failing to conduct adequate research into the safety risks posed by asbestos.

Similarly, Count VI of the Complaint, which is titled "DuPont's Liability in Argentina" alleges that DuPont acted negligently, willfully, and wantonly in allowing asbestos fibers to be utilized in the Berazategui plant, without any caution, warning, or safeguards, and in failing to enforce the same safety regulations in its Argentine subsidiary's plants as it imposed on its own manufacturing facilities in the United States. This Count further alleges that DuPont managers assigned to the Argentine subsidiaries were responsible for the imposition of inadequate safety regulations in the Argentine plant.

The allegations set forth in Count V raise the theory of strict liability as a basis for holding DuPont liable for engaging in an ultra-hazardous activity. This Count

---

6. Fernandez Decl. ¶ 12.

7. *Id.*

asserts that DuPont supplied and distributed asbestos-containing products without providing adequate warnings as to the dangers of asbestos exposure or appropriate safety precautions. Specifically, Plaintiff states that DuPont "assisted, directly or indirectly, in the leasing or licensing of asbestos, asbestos-containing products and all equipment necessary for their (sic) use."

Many of the same statements that are contained in the negligence count (Count IV) are rehashed in Count VII, which alleges willful and wanton conduct. In this Count, Plaintiff seeks to recover punitive damages as a result of DuPont's willful and wanton behavior.

Turning lastly to Count III of the Complaint, which ironically is labeled "Employment Exposure," Plaintiff addresses Rocha's exposure to asbestos as a result of his employment at the DASRL plant in Berazategui from 1963 to 1980. The allegations against DuPont in this Count are incorrectly asserted as though DuPont was Rocha's employer. All of the allegations in this Count, which relate to whether DuPont supplied or otherwise controlled the use of asbestos at the Berazategui plant, are more than adequately covered elsewhere in the Complaint, as discussed above.

## C.  Motion to Dismiss

On July 30, 2010, DuPont filed the instant Motion to Dismiss this Complaint, raising numerous arguments in support of dismissal of each of the Counts of the Complaint, on both legal and factual bases. DuPont argues that the Complaint fails to join DASRL as an indispensable party pursuant to Rule 19; that Plaintiff has sued the wrong party as it was DASRL,

not DuPont, that was Rocha's employer; that the Complaint fails to state a claim against DuPont for the conduct of its subsidiary; that this Court has no jurisdiction over "veil-piercing;" and that Plaintiff's most recent "direct participant liability" theory, amounts to nothing more than repackaged veil-piercing.[8] DuPont further argues that non-economic and punitive damages sought by the Rocha Estate are not recoverable under Argentine law. Finally, DuPont devotes a large portion of its argument in its briefs to its effort to persuade the Court to dismiss the case on the ground of *forum non conveniens*. DuPont contends that all of the factors that must be considered in a *forum non conveniens* analysis require this case to proceed in Argentina, where all the relevant events occurred, where Plaintiff resides, and where the evidence relevant to Plaintiff's claims exists.

## D.  Selection of an Expert on Argentine Law

During the time that the instant motion, and those in the other Argentine cases, were pending, the bulk of the asbestos docket was transferred to another Judge. Much time elapsed while the details of that transfer needed to be clarified. Additionally, the Court's initial assessment of the experts' affidavits raised the possibility that an independent expert would potentially be required. While these matters were being considered, the motions to dismiss in this case and in the other four test cases were held in abeyance.

After reviewing the legal experts' affidavits proffered by the parties, which set forth their opinions on the question of a parent corporation's liability as a direct participant in causing the work-related in-

---

8.  DuPont argues that, even if this Court had jurisdiction over that remedy, which it does not, Plaintiff has failed to plead the factual predicate necessary for piercing the corporate veil.

jury of a subsidiary's employee, and on whether that doctrine would be recognized under Argentine law, the Court initially believed that the experts' conclusions were directly in conflict. As a result, the Court advised the parties, by letter dated October 27, 2011, that it would appoint an independent expert on Argentine law, at the parties' expense, pursuant to Delaware Uniform Rule of Evidence 706. The Court directed the parties to submit the name of an individual to fill that role. In the event they could not agree, they were to submit three names by November 17, 2011, with November 24, 2011 established as the deadline for objections. The parties could not agree on one expert so each timely submitted the names of three experts.

On May 14, 2012, the Court advised the parties, based upon its own research and consultation with legal authorities and scholars in the field, that it intended to proceed with two experts that were not chosen by either party. The Court reasoned that these two experts, one an Argentine corporate lawyer and the other an Argentine labor lawyer, could best assist it with the issues since both labor law and corporate law were implicated by the direct participant liability concept. While DuPont interposed no objections to either of the Court's proposed experts, Plaintiff's counsel strongly opposed both, arguing that these individuals lacked expertise in tort law and would be sympathetic to the concerns of a global multinational corporation, such as DuPont, based on their professional backgrounds.

Plaintiff sent a follow-up letter to the Court on May 25, 2012, again expressing opposition to one of the experts proposed by the Court because he was an Executive Vice President of the International Employers Organization, which considered— but did not pass—a resolution to the effect that chrysotile asbestos is a less dangerous form of asbestos fibers, a defense that Plaintiffs counsel asserted was used by employers in mesothelioma cases in Delaware. Counsel nowhere mentioned how the expert voted on the issue, or why the question before the Court concerning the direct participant liability of a parent corporation to employees of a subsidiary would be affected by the expert's executive role in a labor organization.

DuPont responded by letter, asserting that Plaintiff's concerns were unfounded and irrelevant to the specific legal issue before the Court, particularly since the Court was unlikely to ask for opinions from the Argentine law experts on the relative toxicity of different forms of asbestos. DuPont also pointed out that obtaining a qualified expert with no connection to any trade group, law firm, or academic institution that has at one time or another taken a position on an issue bearing on asbestos litigation would be unlikely and unrealistic. That letter, in turn, prompted yet another expression of disagreement on the part of Plaintiff's counsel wherein he pointed out that his proposed experts had never taken any position on any issues in asbestos litigation.

Ultimately, DuPont's counsel proposed that the Court set a hearing for the parties' designated experts to testify and be cross-examined on the precise issue before the Court. In that way the Court could make its own determination as to whether it actually did require further assistance interpreting Argentine law. It could then appoint its own expert only if necessary, in the event the Court could not reach a conclusion on the viability of Plaintiff's direct liability theory. Not surprisingly, Plaintiff's counsel objected because it would be logistically difficult to schedule a hearing promptly.

By letter of June 28, 2012, the Court advised counsel that it would hold a hearing for the purpose of obtaining testimony from the parties' designated experts on September 10, 2012. Again, there was objection from Plaintiff's counsel and a request that his Argentine law experts testify via videoconference rather than appear in person. He also requested that the Court provide a translator.[9] Plaintiff's counsel again took the opportunity to reargue his position that a parent is not immune from tort liability to its subsidiary's employees for its own, independent acts of negligence, citing as support *Boggs v. Blue Diamond Coal Co.*,[10] a case that is described in detail in the first part of the Complaint. Plaintiff also asserted that "past Delaware asbestos cases" had imposed liability on the corporate parent for its own separate and distinct acts of negli-

gence but provided not a single citation for those "cases." [11]

### E. *The Hearing*

An evidentiary hearing was conducted by the Court on September 10, 2012. At that stage of the proceedings, the Court was focused on what appeared to be conflicting expert opinions regarding whether Argentine courts accepted Plaintiff's theory of direct participant liability on the part of DuPont, the parent corporation. The Court then believed that resolution of that issue, by determining the relative strengths and weaknesses of the experts' opinions, would inform its decision on the ultimate issues presented in the Motion to Dismiss.

Prior to the hearing, as an accommodation to Plaintiff, the Court agreed to allow Plaintiff's two experts to testify by videoconference since they both reside in Ar-

---

**9.** It is inconceivable that Plaintiff's counsel had not considered these logistical problems when he earlier chose to file these cases in Delaware rather than in Argentina, where all Plaintiffs, witnesses, and his experts reside.

**10.** 590 F.2d 655, 658 (6th Cir.1979).

**11.** By letter, DuPont requested that Plaintiff identify the "past Delaware asbestos cases." Plaintiff identified "the *Kojron* litigation in the late 1970's" and *Mergenthaler v. Asbestos Corporation of America, Inc.* He also pointed to several similar Complaints after *Kojron*, none by name, and all of which had been resolved by settlement. Neither of the two cases to which counsel referred provides any authority for counsel's claims that a parent company may be held liable for acts of negligence which caused injury to employees of its subsidiary.

For example, *Kojron* involved an employee of Chevron, who sued his employer (not his employer's great-great grandparent company) as a result of his exposure to asbestos. The decision addressed whether claims for gross negligence or intentional tort could be maintained, or whether they were part of a workers' compensation scheme. The Court held that the workers' compensation law trumped

common law claims and that they were not separately actionable.

Similarly, the *Mergenthaler* case had nothing to do with direct participant liability by a parent corporation. The issue in that case was whether the exclusivity provisions of Delaware's workers' compensation law would bar an employee's suit against the employer for wrongful deprivation of an alleged property right to assert claims arising from an employee's work-related injury against third parties. The decision addressed the question in four consolidated cases filed by asbestos workers and their spouses. The Court concluded that the Workers' Compensation Act bars any action by an employee against his employer for work-related physical injury.

None of the cases to which Plaintiff's counsel referred in his letter response involved actions against a parent company by an employee of its subsidiary based on the concept of direct participant liability.

Plaintiff's counsel's vague assertion that he has "successfully prosecuted claims against Hercules on behalf of Haveg employees in almost four hundred cases" cannot be independently substantiated by the Court and it therefore cannot accept such a bold statement as authority.

gentina. The parties appeared to agree that the substantive law of Argentina would apply to all of the Plaintiff's claims in this litigation. The hearing was protracted because of the need to use two Spanish interpreters as well as the difficulties inherent in receiving testimony from Argentina by videoconferencing equipment.

DuPont's expert, Professor Keith S. Rosenn, testified in person. He is currently director of the Inter–American Law Program at the University of Miami School of Law. He has been a full-time law professor since 1965. The program that he directs focuses on laws of the Americas, principally Latin American law, including Argentina. Professor Rosenn was a visiting Fulbright lecturer twice in Argentina and co-authored a book on Latin American law that has been widely used. He has served as an expert witness over 150 times and as an expert appointed by the Court on three occasions, including once in Delaware.

Professor Rosenn could not identify any reason why the Argentine courts would adopt the theory of direct participant liability, nor was he able to designate any statute or case that adopted the doctrine, as it has been conceived and explained in *Forsythe v. Clark USA, Inc.,*[12] *United States v. Bestfoods,*[13] or the case upon which Plaintiff relies in her Complaint, *Boggs v. Blue Diamond Coal Co.*[14] According to Professor Rosenn, since 1976, when the Foreign Investment Act was passed in Argentina, which restored the separate legal entities of parent and subsidiary, and in essence restored the "corporate veil," it was established law that a parent is not automatically liable for the wrongful acts committed by its subsidiary. Rosenn explained that his understanding of the direct participant liability doctrine is that it is a theory developed by American courts to impose liability upon a parent corporation that has "extraordinarily, or eccentrically interfered with the normal decision making of its subsidiary to the detriment of the subsidiary by directing the subsidiary to engage in a course of wrongful action that foreseeably causes injury to another party."[15] Rosenn testified that the doctrine has been frequently employed in the United States as a way of permitting an employee, who would otherwise be barred from suing his employer under workers' compensation laws, to be able to obtain full recovery. The doctrine has been employed in this country to avoid the limitations imposed by workers' compensation statutes so as to permit an action against the parent company, since it is not the "employer" defined by workers' compensation statutes.

According to Professor Rosenn, there is simply no need for this American theory of liability to be recognized in Argentina because an Argentine employee is not prohibited under Argentine law from bringing a tort action against an employer even if he is also seeking workers' compensation benefits. Thus, the doctrine would be superfluous in Argentina as Argentine tort law provides for complete recovery for an employee.

While acknowledging that his expertise is more general, and that he is not an expert on only the law of Argentina, Rosenn pointed out that none of the experts were able to point to any case law in

---

**12.** 224 Ill.2d 274, 309 Ill.Dec. 361, 864 N.E.2d 227 (2007).

**13.** 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

**14.** 590 F.2d 655 (6th Cir.1979).

**15.** Motion to Dismiss Hearing Transcript ("Mot. to Dismiss Hr'g Tr.") at 32:1–6, Sept. 10, 2012.

Argentina supporting acceptance of the theory. Neither Article 1109, which states the general tort principle that one who causes damage through fault or negligence is obligated to repair the damage, nor Article 1113, which deals with vicarious liability, specifically address the concept of direct participant liability as it has evolved under American law. Moreover, the Plaintiff's experts appear to be confusing liability for the parent corporation's own actions with the theory of direct participant liability. The latter principle makes the parent liable for a subsidiary's tortious conduct by virtue of eccentric or wrongful control, which requires a showing of undue interference or egregious participation in the normal day-to-day affairs of the subsidiary company. And finally, Professor Rosenn emphasized that the allegations of the Complaint deal generally with nonfeasance, which is not a basis for liability of DuPont—even under Article 1109—unless DuPont has assumed an obligation or duty.

At least on paper, Plaintiff's two experts, Alberto Bueres [16] (standing in for Professor Alterini) and Professor Maria Compiani are more specifically skilled in Argentine law as opposed to Latin American law generally. Professor Bueres agreed that DuPont acted on its own with respect to the negligent use of asbestos, as well as giving orders to its subsidiary, and that the two entities are completely autonomous from one another and have two different responsibilities. He stated that "[o]ne is the liability of the main office, and the other liability of the subsidiary[.]" Significantly, neither Professor Bueres, who was substituting for Professor Alterini, nor Professor Alterini had ever studied or consulted the American case law on the subject of direct participant liability.

Because of the press of time,[17] Professor Compiani's testimony was brief but her opinion can best be stated in her own words:

> I have no doubt in my mind as professor Bueres said also in professor Alterini's report if you go to the two articles 1109 and 1113 that you can sue the main office of a company for damages occurred (sic) by an employee of a subsidiary when they are using, manipulating or near dangerous substances.[18]

Professor Compiani had not read any of the opinions in the American cases from which the doctrine of direct participant liability emanated.

Through their affidavits, which appear to have resulted from considerable research, DuPont's experts concluded that there is no basis under any article of the Civil Code of Argentina to hold DuPont, as the corporate great-great grandparent, liable for alleged harm to employees of its subsidiary or members of the employees' households. DuPont's experts found no reported cases in Argentina imposing liability on a parent corporation for the corporation's direct participation in the alleged torts of its subsidiary and opined that it would be quite extraordinary for an Argentine court to create such a doctrine. Were DuPont to be held liable to Plaintiff under Argentine law, it would be necessary for Plaintiff to allege specific evidence of wrongdoing by DuPont employees that would go far beyond the ordinary degree of supervision inherent in the relationship between a corporate parent and its subsidiary.

---

16. Professor Alterini was unable to testify due to illness, and in fact, has since passed away.

17. The Court set aside a full day for the hearing but the use of translators and video-conferencing substantially protracted the proceedings.

18. Mot. to Dismiss Hr'g Tr. at 134:18–23.

## III. *Contentions of the Parties*

It its motion, DuPont raises several grounds for dismissal. First, it submits that the case should be dismissed on the basis of *forum non conveniens* in favor of adjudication in Argentina, as Plaintiff has no significant litigation-related connection to Delaware. Secondly, DuPont asserts that, even if this case were not subject to dismissal for *forum non conveniens*, Plaintiff has failed to join an indispensable party, DASRL, Plaintiff's employer and the owner of the premises where Plaintiff worked. DuPont argues that Martinez has not met her burden of showing that dismissal is not required under Superior Court Civil Rule 19.

DuPont next contends that Plaintiff has failed to plead a viable claim against DuPont for the alleged wrongful conduct of its indirect foreign subsidiary. It maintains that Counts III, IV, V, and VII all target the wrong party, as DuPont was *not* Rocha's employer and did *not* own the Berazategui plant. DuPont argues that Plaintiff has failed to state a claim against DuPont as the corporate great-great grandparent of Rocha's employer, DASRL. It submits that the Complaint consists of generalized conclusions and unspecified allegations of direction and control that do not meet Delaware's pleading standard under Rules 8 and 9 of the Superior Court Civil Rules, which require that Martinez identify the specific conduct that supposedly caused Rocha's injury. Finally, DuPont asserts that the Rocha Estate's claims for both non-economic damages and punitive damages must be dismissed as these are not recoverable under Argentine law.

In response to the motion, Martinez argues that this Court should not dismiss the action *on forum non conveniens* grounds because Argentina is a "grossly inappropriate" forum. She asserts that DuPont cannot satisfy a single factor of the overwhelming hardship standard. Martinez further insists that she has sued the correct party because Argentine law allows a Plaintiff to sue a party who "controls" dangerous wastes and elements such as asbestos in "aggravated strict liability." With respect to her failure to join DASRL, Plaintiff argues, with no citation to authority to support her claim, that "[n]ever has there been a ruling that a motion to dismiss is granted because there is an indispensable party that should have been joined. If so, there would be no asbestos litigation."[19] Throughout her brief, Plaintiff insists that she is suing DuPont, *not DASRL*, and that DuPont is solely liable for the damages to Plaintiff. She asserts that she has "excessively pled [her] claims with particularity." Finally, Plaintiff asserts that the Rocha Estate's claims for non-economic damages should not be dismissed because compensatory damages in Argentina are awarded under a "full compensation principle." Plaintiff does concede, however, that punitive damages are not recoverable in Argentina.

## IV. *Standard of Review*

DuPont moves for dismissal of Plaintiff's complaint based on several grounds, as previously described. All but one of DuPont's arguments are asserted pursuant to Superior Court Civil Rule 12(b)(6), for failure to state a claim upon which relief can be granted, and the remaining argument is based on Rule 12(b)(7), for failure to join an indispensable party. The Superior Court Civil Rules provide two different standards for considering the arguments advanced in DuPont's motion.

---

19. Plaintiff's Answering Brief in Opposition ("Pl.'s Answering Br. in Opp'n") at 22. Plaintiff's Answering Brief, filed October 1, 2010, is incorrectly labeled Plaintiff's "Reply Brief." The Court will refer to this brief as the Answering Brief.

Motions to dismiss for failure to join an indispensable party pursuant to Rule 12(b)(7) require the Court to determine whether joinder of a missing party is needed for just adjudication. That determination is based on criteria set forth in Superior Court Civil Rule 19. The Court must first determine whether a missing party shall be joined in the action if possible.[20] If the party shall be joined but such joinder is not feasible, then the Court must determine whether, "in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent party being thus regarded as indispensable."[21]

Upon a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court's role is to determine "whether [the] plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint."[22] If recovery is possible by the plaintiff, the Court must deny the motion to dismiss.[23] When considering a motion to dismiss, the Court will accept all well-pleaded allegations of fact as true[24] and draw all reasonable factual inferences in favor of the party opposing the motion.[25]

A motion to dismiss for failure to state a claim must be converted to one for summary judgment, however, and disposed of as provided in Superior Court Civil Rule 56 when matters outside of the pleadings are submitted for consideration.[26] When considering a motion for summary judgment, the Court examines the record to ascertain whether genuine issues of material fact exist and to determine whether the moving party is entitled to judgment as a matter of law.[27] Initially, the burden is placed on the moving party to demonstrate that his legal claims are supported by the undisputed facts.[28] If the proponent properly supports his claims, the burden "shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder."[29] Summary judgment will only be granted if, after viewing the evidence in the light most favorable to the non-moving party, there are no material facts in dispute and judgment as a matter of law is appropriate.[30]

Both Plaintiff and Defendant have submitted affidavits and declarations in support of their arguments on the pending Motion to Dismiss.[31] The Court notified the parties that these submissions con-

---

**20.** Super. Ct. Civ. R. 19(a).

**21.** Super. Ct. Civ. R. 19(b).

**22.** *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978) (citations omitted).

**23.** *Id.*

**24.** *Id.; Wyoming Concrete Indus., Inc. v. Hickory Commons, LLC II*, 2007 WL 53805, at *1 (Del.Super. Jan. 8, 2007) (citation omitted).

**25.** *Doe v. Cahill*, 884 A.2d 451, 458 (Del.2005) (citation omitted).

**26.** Super. Ct. Civ. R. 12(b); *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1287 (Del.2007).

**27.** Super. Ct. Civ. R. 56(c).

**28.** *E.g., Storm v. NSL Rockland Place, LLC*, 898 A.2d 874, 879 (Del.Super.2005).

**29.** *Id.* at 880.

**30.** *Id.* at 879–80.

**31.** Both parties have argued that the materials submitted do not require that the Court consider all arguments under the summary judgment standard. *See* DuPont's Supplemental Submission Regarding Argentine Law at 9–10, filed Oct. 1, 2012; *See also* Pl.'s Supplemental Submission Regarding Conversion to Summary Judgment at 3–4, filed Oct. 1, 2012.

tained matters outside the pleadings,[32] and as such, portions of the Motion would be treated as seeking summary judgment.[33] The Court's letter to Counsel served as notice of the conversion of the Motion to Dismiss to one for summary judgment, as required by Rule 12(b), and it additionally provided the parties an opportunity to submit additional pertinent material outside the scope of the pleadings.[34] Both parties then submitted supplemental arguments on the issues raised by the Court's conversion of the Motion to Dismiss to one for summary judgment.

Ultimately, the Court has decided, based on the arguments submitted by the parties, that it will convert only the portions of DuPont's Motion to Dismiss to one for summary judgment which rely upon the material presented in the various affidavits and declarations.[35] As such, factual issues involving the ownership and corporate structure of the various entities in this dispute, and issues involving control and management of the Berazategui Plant will be considered pursuant to the summary judgment standard. All other remaining issues will be considered under the standard for a motion to dismiss.

## V. *Discussion*

Based upon its thorough review of the Complaint, case law, experts' testimony on Argentine law, and the parties' lengthy briefs, the Court concludes that the Motion to Dismiss should be granted on several grounds. First, Counts III, IV, V, and VII assert claims against DuPont as if it was Rocha's employer, when in fact his employer was DASRL. Thus, Plaintiff has sued the wrong party.

Secondly, Plaintiff has failed to establish that her "new" legal theory of liability of the parent corporation for the actions of its indirect subsidiary, the direct participant liability theory, as stated in Counts I and VI, is recognized under Argentine law. Even if it was a viable basis for liability, Plaintiff has failed to allege the necessary predicate facts that would support such a theory.

Thirdly, throughout the entire Complaint, Plaintiff has failed to identify any specific actions by DuPont, as opposed to unsupported conclusory statements, that

32. *See, e.g.,* Fernandez Decl. ¶¶ 4–7 ("[C]ertain of the allegations in the Complaint assert that Mr. Rocha was employed by E.I. DuPont or assert that DuPont directly controlled his working conditions when he worked at the Plant. Employment records in DASRL's possession indicate that Mr. Rocha was employed by DASRL from March 15, 1963 to July 3, 1980, at which time his employment with DASRL was terminated. During his employment for DASRL, Mr. Rocha worked as an electrician in the Nylon Textile division of the Berazategui Plant. DASRL company records confirm that, during the time Mr. Rocha worked at the Berazategui Plant, that Plant was owned and operated exclusively by DASRL. The Berazategui Plant has never been owned or operated by E.I. DuPont.").

33. Letter from the Honorable Peggy L. Ableman, Judge, Superior Court of Delaware, to Thomas C. Crumplar, Esquire, Counsel for Plaintiff, and to John C. Phillips, Jr., Esquire, Counsel for Defendant (Sept. 13, 2012) (E-file Transaction ID 46425032).

34. Super. Ct. Civ. R. 12(b) ("[A]ll parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."); *Appriva*, 937 A.2d at 1288 ("[T]he Superior Court must give the parties at least ten days notice of its intent to convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment.").

35. The Court may convert a portion of a motion to dismiss into a summary judgment motion and consider the remaining portion under Rule 12(b)(6). *See Great American Assurance Co. v. Fisher Controls Int'l, Inc.,* 2003 WL 21901094, at *5 n. 36 (Del.Super. Aug. 4, 2003) (citing *Yaw v. Talley*, 1994 WL 89019 (Del.Ch. Mar. 2, 1994)).

would give rise to the alleged injury. Thus, the Court concludes that those counts must also be dismissed. Even if Plaintiff had stated valid claims allowing it to pierce the corporate veil of DuPont as an alternative to direct participant liability, this Court does not have jurisdiction over such equitable claims.

Fourth, Martinez has failed to join a necessary and indispensable party, DASRL, the indirect foreign subsidiary that was Rocha's employer and the owner and operator of the plant in Berazategui, Argentina, where Rocha claims he was exposed to asbestos.

Finally, although this Court is aware of the difficulty in meeting the "overwhelming hardship" standard for dismissal on *forum non conveniens* grounds, and is not premising dismissal of this case on that basis alone, it is nevertheless mindful of the extraordinary hardship to DuPont if it must defend a case in which it is not the real party responsible for any alleged harm to Plaintiff. Additionally, this Court should not be burdened with cases where the Defendant's state of incorporation is being manipulated to confer jurisdiction on the wrong party. It is greatly inconvenient, unduly costly, and inconsistent with the interests of efficiency for a court in Delaware to: 1) apply the laws of another nation based on translations; 2) impose upon the Defendant the extra costs of discovery, lawyers, and experts that will result by having a trial on another continent from where the alleged tort occurred and where the evidence is located; and 3) decide claims where the Plaintiff is not a resident of Delaware, was not injured in Delaware, and where the Defendant's state of incorporation has no rational connection to the cause of action.

A. *Plaintiff Has Sued the Wrong Party and has Failed to State a Viable Claim Against DuPont for Any Wrongful Actions*

In the Court's judgment, Plaintiff has failed to demonstrate that the Complaint pleads a viable direct claim against DuPont as the corporate great-great grandparent of Rocha's employer, DASRL, under either Delaware or Argentine law.

■ Counts III, IV, V, and VII of the Complaint rely entirely on the incorrect assumption that DuPont is actually the owner and operator of the Berazategui plant and that DuPont was Rocha's employer. DuPont, however, did not own or operate the Argentine facility nor was it Mr. Rocha's employer. It was merely an indirect corporate great-great grandparent of DASRL. Referring to DuPont interchangeably with DASRL in the Complaint, where the allegations are obviously intended to apply to the entity that owned and operated the plant, does not alter the reality of the entities' corporate structures. Inasmuch as all four of these counts target the acts and conduct of Rocha's employer and premises owner, they must be dismissed. Simply stated, Plaintiff has wrongly named DuPont as the employer and premises owner.

■ Moreover, Plaintiff's general claims in Counts I and VI, that DuPont "controlled" or "directed" the use of asbestos at the Berazategui plant, must also be dismissed because these counts allege only generalized conclusions rather than the specific factual circumstances that are required to support a direct liability claim against DuPont under Delaware's pleading requirements.[36] Although Rule 8 does not require that a complaint contain detailed

---

**36.** Plaintiff refers to Argentine law to support the adequacy of its pleadings. Since the governing rules of pleading are procedural, not substantive, Delaware Superior Court Civil Rules apply.

factual allegations, it demands that it is sufficient enough to put the opposing party on notice of the claim brought against it.[37] The United States Supreme Court has described this standard as "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." [38] A complaint must at a minimum state a claim that is conceivable on its face, even when affording the plaintiff reasonable inferences that the defendant, and not some other party, is liable for the misconduct alleged.[39]

No matter how critically one parses the Complaint, and even in light of the liberal standard applicable to motions to dismiss, Plaintiff fails to offer anything but conclusory and non-specific allegations of direction and control that do not give rise to any liability under the law. Since a parent company generally cannot be held liable for the actions of its subsidiary,[40] which it might theoretically have the power to direct and control, the allegations of the Complaint must necessarily be specific and concrete enough to show that the claim being made is something more than a disguised effort to pierce the corporate veil.

These claims must provide at least *some* information to make the parent's liability based on independent actions by the parent itself.

Yet, nowhere in any of the counts of the Complaint is there anything but generalized assertions of direction and control without reference to any specific acts constituting direction or control. None of the cases upon which Plaintiff relies support the position that these general statements are sufficient to state a claim.[41] Merely reciting that Plaintiff is relying on Du-Pont's "own direct separate and distinct tortuous [sic] conduct" in the Complaint, and repeatedly doing so in her brief, is not a substitute for actually identifying specific conduct that caused Rocha's injury. Plaintiff's general allegations that DuPont employees occasionally visited the Berazategui plant, or that DuPont provided "management, engineering, and safety services" to the plant, without specifying a single example of what comprised those services, does not satisfy, with even minimal specificity, the pleading standards of the Delaware Superior Court Civil Rules.[42]

**37.** *Doe v. Cahill,* 884 A.2d 451, 458 (Del. 2005).

**38.** *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court recognizes that the Delaware Supreme Court has expressly declined to adopt the federal court "plausibility" standard, set forth in *Iqbal* and *Twombly,* and instead decided to retain the "conceivability" standard. *See Cambium Ltd. v. Trilantic Capital Partners III L.P.,* 2012 WL 172844, at *1, 36 A.3d 348 (Del.2012) (TABLE) (citing *Cent. Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC,* 27 A.3d 531, 535 (Del.2011)). The Delaware Supreme Court has also, however, stated that it declines "to accept conclusory allegations unsupported by specific facts or to draw *unreasonable* inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co.,* 26 A.3d 162, 166 (Del.2011)

(emphasis added). As such, this Court has applied the conceivability standard utilized in Delaware, but it also declines to accept Plaintiff's unsupported and conclusory allegations, which lack even minimal factual support.

**39.** *See, e.g., Cent. Mortgage Co.,* 27 A.3d at 535.

**40.** *Pauley Petroleum, Inc. v. Cont'l Oil Co.,* 239 A.2d 629, 633 (Del.1968) (disregarding the corporate form of a parent-subsidiary relationship is only permitted upon a showing of certain specific factors in the interest of justice) (citations omitted).

**41.** *Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876; *Boggs,* 590 F.2d 655; *Forsythe,* 309 Ill.Dec. 361, 864 N.E.2d 227.

**42.** *Grobow v. Perot,* 539 A.2d 180, 187 (Del. 1988) ("[U]pon a motion to dismiss, only well-pleaded allegations of fact must be accepted

For example, the Complaint asserts that "[b]ecause of [E.I. DuPont], there were no warnings, or inadequate warnings, as to the safe handling and use of asbestos" at the Berazategui facility. Nothing in that assertion explains in what way DuPont was directly responsible for failing to provide warnings at a plant that was owned and operated by a separate legal entity located on a separate continent over 5,000 miles away. Far more is required than mere general allegations of direction and control to hold a parent corporation responsible for injuries to an employee of a subsidiary, especially since there is already some degree of direction and control inherent in the parent-subsidiary relationship. To hold a parent responsible solely on the basis of the minimal level of control that exists by virtue of the parent-subsidiary bond would destroy the long-established protection afforded shareholders through incorporation.[43]

Plaintiff's repeated assertion in her Complaint that DuPont is liable for "its own direct negligent conduct," and that she is not seeking to hold DuPont liable for any acts committed by DASRL—without more—is not sufficient unless she can identify allegations of specific negligent acts or conduct by DuPont that gave rise to the alleged injury.[44] The Complaint contains no such allegations that show the existence of a duty owed to Rocha, a non-employee of DuPont, or any breach of such a duty.

Nor does Plaintiff's assertion that the pleading rules are relaxed in toxic tort cases, because of the long latency periods between exposure and disease manifestation, provide any help to her. The issue before the Court is the sufficiency of Plaintiff's pleading that DuPont, as the corporate great-great grandparent of Rocha's employer, is liable for those exposures. DuPont has not challenged the sufficiency of Plaintiff's allegations that Rocha was exposed to asbestos or that the asbestos caused injury to him. The standard for reviewing the sufficiency of Plaintiff's pleading on the basis of DuPont's liability as a corporate great-great grandparent is, therefore, not affected in any way by the disease latency period, and the requirement of specificity is in no way diminished merely because this case is a "toxic tort" case.

The Martinez Complaint does appear at first blush to allege new facts, in an attempt to distinguish her case from the twenty or so other cases that Argentine national Plaintiffs have filed in Delaware. Notwithstanding this latest effort, those facts inserted in this Complaint, but not in the others, are either inconsequential or fail to assert any action by DuPont that resulted in Rocha's asbestos exposure.

For example, the Complaint alleges that "asbestos workers" at the plant (Rocha was an electrician in the Nylon division, and *not* an asbestos worker) "wore white overalls in which they sometimes ate lunch at the plant buffet." The Complaint also

---

as true; conclusionary allegations of fact or law not supported by allegations of specific fact may not be taken as true. A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.") (citations omitted), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

**43.** *TI Group Auto. Sys., Inc. v. VDO North America, LLC*, 2002 WL 484838, at *2–3 (D.Del. Mar. 7, 2002); *Lawler v. Penske Logistics, Inc.*, 2005 WL 2758086, at *2 (Mich.Ct. App. Oct. 25, 2005).

**44.** *Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical, France*, 2004 WL 5366102, at *2 (Del.Ch. Mar. 4, 2004).

alleges that DuPont employees "many times" came to the Berazategui plant to "monitor production" and stayed at the Residencial Trianon Hotel, the Callos Hotel or the Quintana Hotel. The clothing that DASRL employees wore, or the hotels where DuPont employees stayed while visiting, hardly establish conduct by DuPont that resulted in Rocha's exposure to asbestos, or for that matter, *any* tortious acts on the part of DuPont that could have caused injury.

In essence, Plaintiff has asserted only broad, conclusory, bare-bones allegations against DuPont, rather than against DASRL. These allegations fail to place DuPont—as opposed to DASRL—on notice of what specific duty it owed to Rocha, or how DuPont—as opposed to DASRL—breached that duty, leaving DuPont clearly unable to prepare a defense to the allegations. Even in the limited circumstances where the Martinez Complaint appears to allege new facts, the mere use of different terminology does not establish a factual predicate for imposing liability against DuPont.

For example, Paragraph 18 alleges that DuPont employees came to the Plant to conduct "[h]ealth, safety and occupational injury audits." Yet the complaint fails to allege that these audits caused harm to anyone nor that they in some way caused Rocha's asbestos exposure. Similarly, in Paragraphs 19, 20, and 25, Plaintiff alleges that DuPont employees "monitored" production at the Plant and "patrolled" the plant to verify that the plant was in compliance with "security and confidentiality protocols" that are not otherwise described. Nowhere is it alleged that the monitoring or patrolling related to asbestos or Rocha's exposure to it.

Again in Paragraphs 21 and 22, Plaintiff alleges that DuPont provided "engineering training for plant manufacturing" to Bera-

zategui but does not even suggest that this training in any way related to asbestos or caused Rocha's asbestos exposure. Even the paragraphs that contend DuPont manuals and newsletters were distributed at the Berazategui Plant (Paragraphs 23 and 24) do not allege that this information was in any way related to Rocha's asbestos exposure.

Finally, Count VI, which is labeled "DuPont's Liability in Argentina," is not premised upon any improper conduct by DuPont. Instead, it relies on some type of unidentified and unstated affirmative obligation that a parent company must have to prevent actions by its subsidiaries. The language in Count VI alleges negligence by DuPont in "allowing asbestos fiber to be utilized ... without any caution, warning or safeguards ..." and contends that DuPont failed "to carry out due diligence" at the Argentine plant. Essentially then, Plaintiff is not only asserting that DuPont controlled and directed activities at DASRL's Argentine facility, rendering it liable to Plaintiff in negligence, but also that it is liable because it did *not* engage in controlling the activities of its subsidiary. These inconsistencies exist throughout the Complaint, largely because Plaintiff repeatedly refers interchangeably to DuPont and DASRL as if they were one and the same entity, and because Plaintiff has not, and cannot, point to any specific action by DuPont that establishes ownership or control of DASRL that is different in any respect from that inherent in the normal parent subsidiary relationship.

### B. There Exists No Precedent or Reason for the Direct Participant Liability Theory in Argentina

Under the "direct participant liability" theory, a parent company can be held liable for the work-related injuries of its subsidiary's employees based upon the

parent company's direct involvement in the subsidiary's conduct that gave rise to the employee's injuries.[45] This theory of liability is a discrete judicially-created doctrine that has developed in several jurisdictions in this country.

In contrast to our common law system, Argentina is a civil law country whose laws are overwhelmingly governed by statute rather than by case law.[46] Argentine courts, unlike their American counterparts, make laws and legal doctrines only in rare and extraordinary circumstances, and are predominantly engaged in interpreting Argentina's Civil Code instead.[47]

Reasoning that if the direct participant doctrine exists at all in Argentina, it would be in the Argentine Code, both of DuPont's Argentine legal experts, Professor Keith Rosenn and Professor Alejandro Garro, conducted extensive statutory research. Neither was able to find any provision establishing existence of the doctrine. They also conducted thorough research in an effort to find Argentine case law that might recognize the concept, but no such cases were found.

During the hearing at which expert testimony was received by the Court, both of Plaintiff's legal experts, Professor Alberto Bueres and Professor Maria Compiani, concluded that DuPont could be held liable in this case in accordance with that doctrine. Yet, their testimony revealed a basic lack of appreciation of the difference between liability in Articles 1109 and 1113 of the Argentine Code, where a party may be held directly liable when it engages in wrongful conduct causing injury to a Plaintiff, from "direct participant" liability, as

that concept has developed in the United States. The latter theory is distinctly different and refers to the situation where a parent company may be held liable when it exercises control over its subsidiary that is "eccentric," i.e., beyond the normal incidence of corporate ownership, and, as a result of that control, the subsidiary causes injury to the Plaintiff. That concept is neither adopted nor mentioned in either Article 1109 or Article 1113 of the Argentine Code. Not surprisingly, neither of Plaintiff's experts mentioned or identified any acts on the part of DuPont that would constitute the type of undue involvement in and control of DASRL that is atypical of the customary parent-subsidiary relationship.

Plaintiffs experts' affidavits appeared at first blush to proffer opinions that were in direct conflict with those of DuPont's experts. At the hearing, however, it became apparent that Plaintiff's experts' blurring of the foregoing distinction accounted for the differences in opinions. When all was said and done, it was obvious to the Court that there is virtually no dispute among the experts about Argentina's approach to compensating employees for injuries caused by the tortious conduct of their employers, whether it be by the direct actions of a parent or by the subsidiary/employer.

The lack of fundamental understanding of the "direct participant" theory can best be attributed to the fact that neither of Plaintiff's experts had actually read any of the American cases that explained the concept, including the one upon which Plaintiff relies heavily in Count I of the Complaint.

---

**45.** *See Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876 (1998); *See also Forsythe*, 309 Ill.Dec. 361, 864 N.E.2d 227; *Born v. Simonds Int'l Corp.*, 2009 WL 5905396 (Mass.Super. Dec. 30, 2009); *Esmark, Inc. v. Nat'l Labor Relations Bd.*, 887 F.2d 739, 759–60 (7th Cir.1989).

**46.** Mot. to Dismiss Hr'g Tr. at 20:14–16, Sept. 10, 2012.

**47.** *See id.* at 20:17–21:3.

Professor Alterini never read the *Forsythe*[48] decision or any of the other United States cases applying the doctrine, and Professor Compiani read summaries of only a few of those cases.[49] Whoever may have prepared those summaries could not adequately have explained the doctrine to her since it was obvious to the Court that she had no understanding of the difference between a parent company's liability for its own tortious conduct (regulated by Articles 1109 and 1113) as distinguished from the direct participant liability theory of American cases involving a parent company's eccentric or extraordinary control.

Moreover, Plaintiff's experts' opinions as to the existence of the doctrine in Argentina were based upon an amorphous obligation of safety contained in a draft statute that was never enacted into law and an article by an Argentine priest that is basically a philosophical statement that individuals generally have a right to be free from unwarranted governmental intrusion.[50]

Furthermore, neither expert had any understanding of how this concept evolved in connection with the limitations imposed on most American workers as a result of workers' compensation statutes, limitations that do not exist in Argentina. And, when questioned directly about any authority upon which they relied, both experts were forced to agree with Professor Rosenn

since they too were not able to identify any statutory or decisional Argentine law recognizing the theory.

Given this lack of understanding of the direct participant liability theory as developed in American case law, the Court cannot accept the conclusory *ipse dixit* opinions of Plaintiff's experts that such a doctrine exists in Argentina. What the Court does conclude is that Professor Rosenn's opinion and his rationale supporting it are extremely persuasive.

Given the fundamental differences in the workers' compensation laws in the United States from those in Argentina, the absence of any direct participant theory in Argentina makes complete sense. In America, workers are barred from suing their employers in tort as they receive statutorily-established benefits as compensation. Argentina does not have a workers' compensation exclusivity bar.[51] Argentine workers are not prohibited from suing their employers in tort—and all experts are in agreement on this point—even if they also collect workers' compensation benefits in Argentina's labor courts.[52] American workers, by contrast, typically assert the "direct participant" theory against the parent of their employer in an effort to circumvent the exclusivity bar of their state's workers' compensation systems.[53]

---

**48.** 224 Ill.2d 274, 309 Ill.Dec. 361, 864 N.E.2d 227 (2007).

**49.** It is not clear which decisions were summarized or by whom, as they were not attached to Professor Compiani's submission.

**50.** Article 19 of Argentine Constitution provides: "The private actions of men which in no way offend public order or morality, nor injure a third party, are only reserved to God and are exempted from the authority of judges. No inhabitant of the Nation shall be obliged to perform what the law does not

demand nor deprived of what it does not prohibit."

**51.** Mot. to Dismiss Hr'g Tr. at 117:12–23, Sept. 10, 2012.

**52.** *Id.* at 117:20–23. The parties agree that there is no workers' compensation exclusivity bar in Argentina, and workers may sue an employer in tort as well as recover workers' compensation benefits there.

**53.** *See, e.g., Boggs*, 590 F.2d 655 (widows of deceased coal miners brought wrongful death

Given that there is no practical or policy reason for the direct participant liability doctrine to exist in Argentina it is not surprising that it has never developed. Under the circumstances, this Court will not assume the existence of such a doctrine without any rationale for it, any case law defining it, or any part of the Argentine Civil Code authorizing it. The Court therefore concludes that DuPont's expert opinions are more reliable, sound, and based upon reason and common sense.

### C. Plaintiff Failed to Join an Indispensable Party

In its Motion to Dismiss Plaintiff's Complaint, DuPont asserts, pursuant to Superior Court Civil Rule 19, that Plaintiff has failed to join "the real party in interest and the real target of her occupational asbestos claims." Since DASRL cannot be joined in this action, DuPont claims that DASRL is an indispensable party, and "in equity and good conscience" this action must therefore be dismissed.

Under Rule 19(a) this Court is first required to determine whether DASRL is a necessary party. Rule 19(a)(2)(i) provides that an absent party "shall be joined" if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.[54]

Superior Court Civil Rule 19 is virtually identical to its Federal counterpart, Federal Rule of Civil Procedure 19. In general, Delaware Courts respect authorities applying Federal Rules and those decisions are given "great persuasive weight" in the construction and application of a parallel Delaware Rule.[55] Thus, this Court has sought guidance from federal decisions in its determination of whether DASRL is a necessary party, and if so, whether it is also an indispensable party.

At the outset of this analysis, the Court notes that the burden of proof in the context of a Rule 19 determination is initially on the moving party, in this instance DuPont, to demonstrate that the absent party that must be joined, but cannot be, is needed for a just adjudication.[56] Once the moving party has satisfied that burden, the Court must then determine whether the absent party, whose interests are adverse to the moving party, can negate that conclusion. A failure to meet that burden will require dismissal of the action.[57]

In the case at bar, there is no dispute that most of Plaintiff's allegations concern the actions of Rocha's direct employer, DASRL, and not DuPont, its corporate

---

action against employer's parent corporation to recover amounts above those provided pursuant to worker's compensation laws); See also Forsythe, 309 Ill.Dec. 361, 864 N.E.2d 227 (estates of deceased employees brought wrongful death suit against employer's parent corporation in addition to receiving benefits pursuant to worker's compensation act.).

**54.** Super. Ct. Civ. R. 19(a).

**55.** Cede & Co. v. Technicolor, Inc., 758 A.2d 485, 490 (Del.2000) (citing Cede & Co. v. Technicolor, Inc., 542 A.2d 1182, 1191 n. 11 (Del.1988)).

**56.** Roberts v. Delmarva Power & Light Co., 2007 WL 2319761, at *3 (Del.Super. Aug. 6, 2007) (quoting Fedirko v. G & G Const. Inc., 2007 WL 1784184, at *3 (Del.Super. May 22, 2007)).

**57.** Fedirko, 2007 WL 1784184, at *3.

great-great grandparent. Repeatedly and in conclusory fashion, Plaintiff claims that it is suing DuPont for its "own direct, separate and distinct tortuious (sic) conduct" that injured Rocha.[58] Yet, Plaintiff's factual support for this "direct liability" is largely non-existent. The specific statements presented to support the allegations are limited to the following irrelevant facts: (i) employees wore white overalls when they ate lunch at the plant's buffet; (ii) DuPont employees traveled to Argentina and stayed at three different hotels; (iii) corporate newsletters and manuals were delivered to DASRL's plant and translated into Spanish; and (iv) DuPont provided bags with the label "asbestos" on the outside, or it provided the funds to purchase those bags.[59]

Plaintiff's minimal factual support for its efforts to hold DuPont liable for its "own direct, separate and distinct" wrongful conduct is either irrelevant or hardly distinguishable from the ordinary conduct of any parent corporation. But even more notably, the allegations in Plaintiff's Complaint refer directly to Rocha's employer, DASRL, and not to its corporate great-great grandparent, DuPont. None of the foregoing allegations suggest any tortious conduct causing injury exclusively on the part of DuPont. In the final analysis, the lack of any articulated distinction between the alleged acts of DuPont from those of DASRL make Rocha's employer an active participant in the conduct that is alleged against its parent.

In a trial on the merits, DuPont would likely mount a defense consistent with the arguments it has made since this litigation began. It has asserted, and will likely continue to assert, that DASRL is solely liable as Rocha's employer. If the jury accepts DuPont's argument that DASRL was responsible for the plant and work site, DASRL will be at least partially liable for damages. In a potential later trial in the appropriate forum, DASRL would claim that DuPont should be solely responsible for Rocha's injuries. This circumstance would leave both DuPont and DASRL subject to a substantial risk of incurring double or otherwise inconsistent obligations, the precise result that Rule 19 seeks to prevent. Moreover, since Plaintiff is demanding monetary relief for damages caused solely as a result of Rocha's employment at DASRL, the Court concludes that DASRL, although an indirect subsidiary of DuPont, has a paramount interest in the subject of this litigation. Its presence is crucial to the determination of the important issue of liability. Without its joinder, DASRL's ability to protect that interest may be impaired. DASRL is more than a witness to the activities at issue in this case—it is an active participant.

When confronted with similar factual circumstances, federal courts in cases such as this have consistently held that a subsidiary is a necessary party in a suit against the subsidiary's parent corporation where the subsidiary is an active participant in the activity that is alleged as the basis for recovery.[60] In applying the fac-

---

**58.** Plaintiff's Complaint ¶ 10.

**59.** Plaintiff's failure to plead with particularity is another independent ground for dismissal.

**60.** *Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553, 559–60 (5th Cir.1985) (In a suit against the parent corporation, a subsidiary is

a necessary party if it "emerges as an active participant in the alleged" tort.); *Ethypharm S.A. France v. Bentley Pharm., Inc.*, 388 F.Supp.2d 426, 431 (D.Del.2005) (A subsidiary is a necessary party where the plaintiff's interactions were almost entirely with the subsidiary and the plaintiff brought suit against the parent corporation alone.); *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*,

tors in Rule 19(a), these Courts have held that, without the absent party, the parties before the court may be prevented from obtaining complete relief [61] and the subsidiary may suffer prejudice if the case is litigated without it.[62]

In *Gay v. AVCO Financial Services, Inc.*,[63] for example, the United States District Court for the District of Puerto Rico held that the subsidiary was a necessary party in an action filed by an employee who sued the parent corporation of his former employer for age discrimination after he was dismissed from his job. Plaintiff could not bring his claims directly against the subsidiary employer in District Court because the employer's presence would have destroyed diversity jurisdiction. Plaintiff's cause of action plainly implicated the actions of his employer, who was ultimately responsible for his termination. The District Court found the subsidiary/employer to be necessary because, if absent, it would not be able to protect its interests in the case. The Court speculated that the parent company would likely attempt to shift liability to the subsidiary. If sued in a subsequent action, the subsidiary, in turn, could maintain a defense that

the parent was responsible. The prospect of multiple litigation on the same set of facts, with potentially inconsistent results, and the added potential of leaving the plaintiff without any remedy, required dismissal.

Similarly, the District Court for the District of Minnesota, in *Polanco v. H.B. Fuller Co.*,[64] found that a non-party subsidiary's joinder was necessary, and that party was indispensable, in a wrongful death action regarding the manufacture and sale of industrial-grade adhesives that were being inhaled by young children on the streets of Guatemala. The drug produced a "high," or warm, pleasing sensation to the empty stomachs of the street children. The glue was highly addictive and repeated abuse led to neurological damage and death. The plaintiff sued Fuller–US, the parent company of Fuller–Guatemala, which was the company responsible for manufacturing the glue that was allegedly used. The Court reasoned that the subsidiary faced a damaging judgment in an action where it was not present to protect itself. Significantly, the District Court in *Polanco* specifically rejected the argument that a parent corporation should be able to protect the interests of its sub-

---

201 F.R.D. 337, 340 (D.Del.2001); *Polanco v. H.B. Fuller Co.*, 941 F.Supp. 1512, 1520–23 (D.Minn.1996) (collecting cases holding that a subsidiary is a necessary and indispensable party where the subsidiary's conduct is directly at issue in the plaintiff's allegations.); *Gay v. AVCO Fin. Serv., Inc.*, 769 F.Supp. 51, 56 (D.P.R.1991) ("Where the subsidiary is an active participant in the activity alleged as the basis for recovery, the subsidiary should be a party to the action."); *Lopez v. Shearson American Express, Inc.*, 684 F.Supp. 1144 (D.P.R.1988) ("The law appears very clear that where the subsidiary is the primary participant in a dispute involving both the parent and the subsidiary, the subsidiary is an indispensable party.").

61. *Ethypharm S.A. France*, 388 F.Supp.2d at 431 (The plaintiff may be prevented from ob-

taining complete relief if the absent subsidiary is found partly or completely liable. (citing *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831 836 (D.Del.1978))).

62. *See Polanco*, 941 F.Supp. at 1521 (The court "identified no way in which a judgment could be shaped or limited to avoid prejudice to the subsidiary." (citing *Dou Yee Enter. (S) PTE, Ltd. v. Advantek, Inc.*, 149 F.R.D. 185 (D.Minn.1993))); *Glenny v. American Metal Climax, Inc.*, 494 F.2d 651, 653 (10th Cir. 1974) (A parent corporation has no ability to protect its own interests if it is unable to be joined in a suit involving actions of its corporate subsidiary).

63. 769 F.Supp. 51.

64. 941 F.Supp. 1512.

sidiary, since it recognized that their "interests may well diverge at trial." [65] In language that is equally persuasive here, the District Court analyzed the indispensability of Fuller–Guatemala as follows:

> Consideration of the factors enunciated in Fed.R.Civ.P. 19(b) leads to the conclusion that Fuller–Guatemala, the undisputed manufacturer of a product bearing its own name is an indispensable party in this products liability action. The exact effect which would be given a judgment adverse to Fuller–US on Fuller–Guatemala's ability to litigate in Guatemala is unknown. However, plaintiff's Complaint necessarily implicates Fuller–Guatemala's distinct and strong interest in legal determinations regarding the safety of its products. Nor is there any way, even under plaintiff's design conception theory, that a judgment against Fuller–US will not be speaking directly and adversely to the quality of Fuller–Guatemala's products. [66]

■ As with the circumstances in Fuller–Guatemala's case, so too is DASRL directly implicated in Martinez's Complaint and so too are its interests likely to be distinct from DuPont's, which will undoubtedly ascribe responsibility to DASRL, an entity not directly represented in this action.

Despite the fact that Plaintiff refers to her claims against DuPont as "independent," it is apparent on the face of the Complaint that those claims necessarily derive completely from the relationship and dealings between DASRL and DuPont. The fact that DASRL is the Argentine subsidiary that employed Rocha, and owned and operated the manufacturing facility where his alleged asbestos exposures occurred, demonstrates that DASRL is needed for just adjudication. DASRL is a "necessary" party under Rule 19(a).

Since the parties are in agreement that DASRL cannot be joined as a party in this case under Rule 19(b), the Court must decide whether it is also an indispensable party and whether, in equity and good conscience, this action should be allowed to continue or be dismissed. Rule 19(b) sets forth four criteria that must be considered in determining indispensability:

> If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the Court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the Court include: First, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

■ The Court initially turns to the first factor—the extent to which a judgment rendered in the person's absence might be prejudicial to him or to those already parties. Any judgment entered without the presence of DASRL as a party subjects DuPont to being judged solely responsible for a liability which, if it exists at all, it undoubtedly shares. DuPont has a distinct interest in having the question of liability decided consistently as to all supposed wrongdoers. Without DASRL's joinder, DuPont may be forced to assume full responsibility for a liability that may

---

**65.** *Id.* at 1522.

**66.** *Id.* at 1521.

be DASRL's alone or that it may only share with DASRL. It may ultimately be required to pursue a second lawsuit against DASRL for indemnity or contribution, an unnecessary waste of time and expense that would not be incurred if these claims were litigated in the appropriate forum against the proper defendant. DuPont will also be subject to the possibility of inconsistent verdicts. Most importantly, the presence of the company that employed Rocha and owned and operated the plant where he was exposed to asbestos could be crucial to DuPont's defense.

Besides the prejudice to DuPont by DASRL's absence, DASRL would also be prejudiced. It is not required that any finding of liability on DASRL's part be binding in order to show prejudice.[67] The practical prejudice of a verdict or decision to the absent party, even if it is not bound by it, is the effect that the case may have as precedent.

Considering next the second factor, i.e., the extent to which the prejudice can be lessened by the shaping of relief through protective provisions in the judgment, this Court cannot envision any modifications to a judgment that would reasonably or adequately protect DuPont or DASRL. Nor has the Plaintiff offered or suggested any means or alternatives by which the prejudicial effects may be minimized.

The third factor in the Rule 19(b) analysis is "whether a judgment rendered in the person's absence will be adequate." The United States Supreme Court has interpreted this third consideration to refer to the interest of the courts and the public "in settling disputes by wholes, wherever possible[.]"[68] Resolution of a dispute in a single lawsuit not only furthers the interests of the parties but also that of the public in avoiding repeated lawsuits on essentially the same set of facts.[69] The public interest in conserving valuable judicial resources by having one adjudication involving all interested parties weighs heavily in favor of finding DASRL indispensable. A single action in Argentina will serve judicial economy and eliminate the possibility of multiple suits.

Finally, under the fourth factor, the Court must determine whether the Plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. This factor weighs decidedly in favor of dismissal. Without question, Plaintiff has a satisfactory forum available in Argentina. After a full day of testimony from Argentine legal experts, all agreed that employees in Argentina have additional rights that would not be available to their counterparts in America.[70] While American workers are generally limited to receiving benefits from their employers pursuant to a legislative workers' compensation scheme,[71] Argentine Plaintiffs are able to sue their employers in tort *in addition to* receiving workers' compensation benefits.[72]

The Argentine law experts described Argentina's compensation system for occupationally-related injuries in detail. It is designed to ensure full compensation for

---

**67.** *Schutten v. Shell Oil Co.*, 421 F.2d 869, 874 (5th Cir.1970); *Evergreen Park Nursing & Convalescent Home, Inc. v. American Equitable Assurance Co.*, 417 F.2d 1113, 1115 (7th Cir.1969).

**68.** *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

**69.** *Evergreen Park*, 417 F.2d at 1115.

**70.** Mot. to Dismiss Hr'g Tr. at 33: 10–22, 128: 13–15, 142: 6–8, Sept. 10, 2012.

**71.** *United States v. Demko*, 385 U.S. 149, 151, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966) (citations omitted).

**72.** Declaration of Professor Atilio A. Alterini ("Alterini Decl.") ¶ 7; Declaration of Professor Keith S. Rosenn ("Rosenn Decl.") ¶ 16.

occupational injuries in accordance with the country's strong public policy promoting occupational safety and health.[73] The Argentine Civil Code provides an all-purpose negligence statute that would be applicable to this action. The system in place in Argentina is uniquely qualified to compensate claimants like Plaintiff for a decedent's work-related illness and death, as it is highly favorable to the employee and presumes employer misconduct or negligence if an injury has occurred.[74] Surviving spouses are also entitled to pursue benefits for a decedent under the Argentine system. Plaintiff does indeed have an adequate remedy in Argentina.

Neither Plaintiff nor the Rocha Estate will be prejudiced if this action is dismissed for nonjoinder of an indispensable party. If the claims asserted by Plaintiff have any merit, it is DASRL's misconduct that is really at issue in this case, as it is the real party in interest, and the immediate wrongdoer in this litigation. Equity and good conscience require dismissal under these circumstances. The potential prejudice resulting from prosecution of this action far outweighs any benefit in proceeding in this forum.

D. *DuPont has Demonstrated "Overwhelming Hardship" and Dismissal is Required Under the Forum Non Conveniens Doctrine*

1. *Facts Relevant to the Doctrine and the Parties' Contentions*

To appreciate the Court's analysis on this issue and to place it in context, some of the significant facts need to be repeated here. This case is one in a series of cases filed by Plaintiff's counsel's law firm, Jacobs & Crumplar, all of which involve asbestos claims that are alleged to have arisen from employment conditions at textile plants in Argentina. The Plaintiffs or their Argentine family members were allegedly exposed to asbestos while working for an Argentine company in Argentina. The injuries that occurred in Argentina were diagnosed in Argentina, and were treated in Argentina. The filing of this initial batch of cases, all on behalf of Argentine nationals, was preceded by a press release, issued by the Plaintiffs' law firm, Jacobs & Crumplar, which announced that it is seeking information or evidence of additional cases related to DuPont's use of asbestos overseas. DuPont's counsel aptly pointed out that it is likely these cases herald "the next wave of asbestos litigation" which would be filed in the State of Delaware from Latin America, Africa, and Asia. The press announcement included the statement that additional foreign cases, similar to these, were "soon to follow." [75]

In its Motion to Dismiss, DuPont takes great pains to persuade the Court that litigating this case in a Delaware Court would impose an "overwhelming hardship" on it since Argentina is where all of the relevant events took place, where all of the witnesses and documents are located, where Martinez lives, where decedent's actual employer and the plant where he was

---

73.  Mot. to Dismiss Hr'g Tr. at 33:10–22, 35:3–13, 131:18–22, 142:6–11, Sept. 10, 2012.

74.  *Id.* at 88:17–20, 118:5–19, 126:8–23.

75.  Press Release, Jacobs & Crumplar, DuPont Exports Disease and Cancer from Asbestos Exposure to Argentina (June 16, 2009) (attached to Defendant's Motion to Dismiss as Exhibit A) ("Three Argentinian workers from [the Mercedes, Argentina] plant have today filed suit against DuPont for asbestos-related injuries caused by their workplace exposure to asbestos. More are soon to follow ... [M]any American companies still continue to promote the use of deadly asbestos in Latin America, Africa, and Asia ... [Jacobs & Crumplar] also request[s] assistance in obtaining any information or evidence related to DuPont's use of asbestos overseas.")

exposed are located, where the occupational injury laws and courts are well equipped to handle such claims, and where the courts have a paramount interest in adjudicating these cases, as it is Argentine law that will apply to them. DuPont further underscores the overwhelming burden that this new wave of asbestos claims, involving employees and premises from around the world, would have upon the Superior Court's ability to manage and dispose of its docket timely and effectively.

Contrary to DuPont's argument, Plaintiff asserts that Argentina is an "inappropriate" forum for resolution of this dispute and that DuPont has failed to demonstrate the "overwhelming hardship" necessary for this Court to stay or dismiss this action on the basis of *forum non conveniens*. She points out that Defendant cannot satisfy a single one of the factors that must be considered in its analysis under *General Foods Corp. v. Cryo–Maid, Inc.*[76] (the "*Cryo–Maid* factors").

### 2. The Doctrine in Delaware

*Forum non conveniens* is a common law doctrine that developed as a means by which a "court may resist imposition upon its jurisdiction even when jurisdiction is authorized."[77] The doctrine empowers the Court to decline jurisdiction when it determines that litigating in the plaintiff's chosen forum would be inconvenient, expensive, or otherwise inappropriate.

Delaware's *forum non conveniens* jurisprudence leaves little doubt that this state has a strong preference for respecting a plaintiff's choice of forum. The series of Delaware Supreme Court decisions that have reversed trial court orders granting motions to dismiss on *forum non conveniens* grounds manifest this preference clearly.[78] One court has gone so far as to characterize the heavy burden placed upon a defendant as a "presumption" that the plaintiff's choice of forum will be given great deference, except in rare instances where defendant is able to establish that it would endure "overwhelming hardship" by litigating in Delaware.[79]

Indeed, a thorough review of Delaware cases applying the standard would seem to suggest that the doctrine of *forum non conveniens* is all but non-existent in this state. In virtually every instance where the doctrine has been invoked to support dismissal, the strong showing that is required by defendant to demonstrate that this "drastic" relief is warranted has rarely been established.[80] The burden is simply that substantial.

Notwithstanding the extreme difficulty of obtaining relief on this basis, there are still suggestions in several of the decisions that the burden is not preclusive and that "there is a proper place for dismissals" in Delaware based *on forum non conveniens*.[81] Whether those references are merely lip-service to the doctrine or true expressions of the law is yet to be seen.

**76.** 198 A.2d 681 (Del.1964).

**77.** *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

**78.** *Candlewood Timber Group, LLC v. Pan American Energy, LLC*, 859 A.2d 989, 998–1000 (Del.2004); *Mar–Land Indus. Contractors, Inc. v. Caribbean Petroleum Refining, L.P.*, 777 A.2d 774, 778–79 (Del.2001); *Ison v. E.I. DuPont de Nemours and Co., Inc.*, 729 A.2d 832, 842 (Del.1999).

**79.** *In re Asbestos Litig. (Abou–Antoun)*, 929 A.2d 373, 380–81 (Del.Super.2006) (citing *Mar–Land*, 777 A.2d at 777–78).

**80.** *See Mar–Land*, 777 A.2d at 778; *See also Candlewood*, 859 A.2d at 998.

**81.** *Warburg, Pincus Ventures, L.P. v. Schrapper*, 774 A.2d 264, 267 (Del.2001); *Ison*, 729 A.2d at 842.

There is also some reference made in prior decisions to the fact that, in a proper case, considerations of "public interest" factors, such as the administrative difficulties caused by court congestion, the burden imposed on Delaware courts and juries to absorb a substantial increase in filings by persons that have no real connection to Delaware, particularly in asbestos cases, and the difficulties associated with the application of foreign law, could in fact lead to reconsideration of the doctrine as it has historically been applied.[82]

For example, in rejecting *forum non conveniens* as a basis for dismissal of several complaints by out-of-state plaintiffs alleging exposure to asbestos outside of Delaware, the Court in *In re Asbestos Litigation (Abou–Antoun)* left open a small window for reconsideration in the event that a substantial increase in filings would adversely affect the court's ability to efficiently manage its docket, or would overwhelm its judicial or administrative resources:

> As to the future, it may well be that a substantial increase in asbestos filings will have a deleterious impact on the efficiency of this Court and cause unmanageable congestion. That said, the Court is unwilling to speculate about such consequences or even to assume, as the defendants predict, that the "floodgates" will open to future filings as a result of this decision. Such conjecture would not only be improper, it would be illusory at best as the Court cannot possibly predict the ramifications of an increase in asbestos filings on the important aspects of the Court's functions and duties. For now, the Court is satisfied that the "public interest" factors do not mandate dismissal. If necessary, the Court will revisit this question if the asbestos landscape in Delaware changes dramatically in the future.[83]

While the Court is indeed functioning adequately—though not as efficiently as litigants would desire—with the multitude of asbestos cases now before it, the burden on the one judge assigned to the asbestos docket is barely manageable. The specter of a "new wave" of filings from plaintiffs not just from other states, but literally from around the world, in addition to this and the other twenty or so Argentine cases now before the Court, may render this case the appropriate time and opportunity to revisit whether Delaware can expand its virtual "open door" policy to encompass this and other foreign cases "soon to follow." Stated another way, if the doctrine of *forum non conveniens* does truly have any viability in this state—and the Delaware Supreme Court has promised that it does—then the facts of this case may prove the rare opportunity for its application.

### 3. *Application of the Cryo– Maid Factors*

■ Under well-established Delaware decisional law, the defendant's burden is to demonstrate "with particularity" that application of the *Cryo–Maid* factors, as a

---

**82.** *Taylor v. LSI Logic Corp.,* 689 A.2d 1196, 1201 (Del.1997) ("The Court of Chancery did not predicate its decision upon the inherent power of a trial court to control its own docket, manage its affairs, achieve the orderly disposition of its business and promote the efficient administration of justice. We do not decide this question, but we note that nothing we decide herein is intended to preclude such an argument from being made in a proper case."); *Abou–Antoun,* 929 A.2d at 388–90 ("The Delaware Supreme Court has not considered 'public interest' factors when reviewing motions to dismiss based on *forum non conveniens.* At the same time, however, it has not expressly rejected the 'public interest' factors either.").

**83.** *Abou–Antoun,* 929 A.2d at 389–90.

whole or separately, establish that litigating in Delaware would impose "an overwhelming hardship." The *Cryo–Maid* factors are as follows:

    (1) the relative ease of access to proof

    (2) the availability of compulsory process for witnesses

    (3) the possibility of the view of the premises

    (4) whether the controversy is dependent upon the application of Delaware law which the courts of this state more properly should decide than those of another jurisdiction

    (5) the pendency or nonpendency of a similar action or actions in another jurisdiction; and

    (6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive [84]

The foregoing factors "do not, of themselves, establish anything" [85] but "merely provide the framework for an analysis of hardship and inconvenience." [86] Comparison of the forum chosen by the Plaintiff with an alternative jurisdiction in order to determine which is more appropriate, is not permitted and is considered irrelevant to the analysis.[87] The sole basis for deciding a motion to dismiss on *forum non conveniens* grounds is whether the *Cryo–Maid* factors indicate that defendant will suffer overwhelming hardship and inconvenience if forced to litigate in Delaware. Unless that showing can be made, the plaintiff's choice to file suit in Delaware will be honored.

DuPont has vigorously argued that this case is the rare one that satisfies the "overwhelming hardship" standard as it will impose unique and severe burdens on DuPont. Its argument is supported by detailed and particularized affidavits as is required by case law.[88] DuPont also presents convincing public interest arguments concerning the impact that this case, and the large numbers of new cases brought by Plaintiff's counsel, would have upon the Delaware Courts, especially when the Defendant's state of incorporation has no rational connection to the cause of action. Finally, DuPont sets forth in precise detail the remedies available to its subsidiaries' employees in Argentina, which are more extensive than those offered to the citizens of this state.

In response, Plaintiff submits that DuPont cannot satisfy any of the *Cryo–Maid* factors and that no single factor standing alone meets *Cryo–Maid's* "overwhelming hardship" standard. Plaintiffs primary argument against a *forum non conveniens* dismissal is that Argentina "most likely lacks jurisdiction to hear the suit," and is therefore not an adequate alternate forum. Plaintiff provides no support for this assertion and the affidavits from her Argentine lawyers do not even refer to Argentina's jurisdiction over DuPont.

---

**84.** *General Foods Corp. v. Cryo–Maid Inc.*, 198 A.2d 681, 684 (Del.1964), overruled in part on other grounds, *Pepsico, Inc. v. Pepsi–Cola Bottling Co. of Asbury Park*, 261 A.2d 520 (Del. 1969).

**85.** *Taylor*, 689 A.2d at 1199 (quoting *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. P'ship*, 669 A.2d 104, 108 (Del.1995)).

**86.** *Taylor*, 689 A.2d at 1199; *Chrysler First*, 669 A.2d at 108.

**87.** *E.g.*, *Mar–Land*, 777 A.2d at 779 (citation omitted).

**88.** *See Candlewood*, 859 A.2d at 994; *See also Aveta, Inc. v. Colon*, 942 A.2d 603, 609 (Del. Ch.2008) ("[M]otions to ... dismiss can be and are decided on facts presented in affidavits. To establish overwhelming hardship with particularity, a defendant should identify particular, specific evidence necessary to its case that it will be unable to produce in Delaware.") (internal citations omitted).

Plaintiff relies upon *Ison v. E.I. DuPont de Nemours* [89] as authority for its position. In *Ison*, the Delaware Supreme Court reversed the Superior Court's finding that DuPont would be subject to overwhelming hardship if forced to defend products liability claims filed by foreign families whose claims arose out of alleged birth defects caused by Benlate, a chemical agent manufactured by DuPont.

Plaintiff also cites the Superior Court decision in *Lluerma v. Owens Illinois* [90] as support for her opposition to the Motion to Dismiss on *forum non conveniens* grounds. In that case, the Court based its decision in part on the fact that Spain might have lacked jurisdiction over the case.

As an initial inquiry in a *forum non conveniens* analysis, the Court is required to determine whether Argentine courts are capable of providing an adequate alternate forum. From the Court's review of all the legal experts' declarations and the case law, it is satisfied that Argentina has well developed standards and processes to address and provide compensation for meritorious asbestos injury claims arising within its borders.

The Argentine Courts clearly have jurisdiction over the Plaintiff and over DASRL, the actual employer and proper defendant in this case. There is (or was) a succession proceeding pending in the Court of the City of La Plata, Argentina relating to the Rocha estate.[91] The Argentine courts would apply Argentine law to these claims since the exposure allegedly occurred there and Plaintiff resides there. In fact, Plaintiff has conceded that Argentine law would apply to her claims. Significantly, Argentina has a well-developed legal procedure that provides both comprehensive workers' compensation and tort remedies for occupational injuries and illnesses such as those being pursued here.[92]

While there exist decisions where courts have stated that less deference should be accorded to the plaintiff's choice of forum when that plaintiff elects to bring suit a great distance from home,[93] this Court is acutely aware of Delaware case law in which the Court has noted that, even though plaintiffs are foreign nationals, this fact does not deprive them of the presumption that their choice of forum should be respected.[94] The Delaware Supreme Court has further refined this principle by its statement that the presumption "is not as strong in the case of a foreign national plaintiff as in the case of a plaintiff who resides in the forum[.]"[95]

Notwithstanding the presumption, the fact that virtually all of the records will be Spanish language documents, which will require translation to English before DuPont can use them in its defense, contributes mightily to DuPont's hardship. The burdens placed upon the parties and the Court, in litigating a case in English when the participants are all Spanish-speaking and appear by videoconference rather than in person, cannot be underestimated.[96]

89. 729 A.2d 832.

90. 2009 WL 1638629 (Del.Super. June 11, 2009).

91. Declaration of Miguel N. Armando ¶ 3.

92. Mot. to Dismiss Hr'g Tr. 128:2–12, Sep. 10, 2012.

93. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

94. *Ison*, 729 A.2d at 842.

95. *Id.* at 835.

96. At the hearing on September 10, 2012, the Court was confronted with the suggestion that one of the witnesses testifying in Argentina may have been receiving information from an unknown individual during his testimony. Without the witness being present in the

The all-day hearing this Court conducted to accept testimony from Argentine legal experts not only highlighted the difficulties inherent in using translators but demonstrated how time-consuming the process can be.

Mindful of the heavy burden placed upon DuPont to justify dismissal, the Court now turns to an assessment of each of the six factors that must be considered under *Cryo–Maid.*

### a.  *Relative Ease of Access to Proof*

DuPont argues that it would be subject to overwhelming hardship if it were required to litigate in Delaware while conducting virtually all of the discovery in Argentina.  It argues that the vast majority of records are in Argentina and much of that evidence is in the possession of third parties.  Plaintiff acknowledges that most of the relevant documents are in Spanish and that the witnesses do not speak English, which may create some hardship, but argues that is not "overwhelming" hardship.  Plaintiff also claims that "documents and other evidence related to this litigation are situated in Delaware" but then does not identify a single witness, document, or other evidence located here.  While the burden is not on Plaintiff to identify any evidence in Delaware, the assertion that relevant evidence is here is rather dubious.

DuPont specifically identifies the type of evidence it believes would be difficult and costly to obtain.  That evidence includes Rocha's medical records, testimony of his treating physicians, plant records documenting the location and use of asbestos, and evidence related to any other potential sources of asbestos to which Rocha may have been exposed.  Compelling produc-

tion of such evidence is expensive and unreliable.

DuPont argues that few, if any, sources of proof for Plaintiff's case are located in Delaware.  Plaintiff responds by asserting that it needs documents and evidence located in this state.  From the Court's experience and knowledge about the types of evidence likely to be important in an asbestos employment exposure case, the Court is not convinced that there is any evidence located in Delaware, and Plaintiff has not even identified the type of evidence that could show liability on the part of DuPont.  Since Plaintiff is attempting to hold DuPont liable for the actions of its distant subsidiary it is not surprising that she has not identified a single piece of evidence that would be in DuPont's control and possession, rather than in the hands of the management of the DASRL-owned Berazategui plant and its employees.

Plaintiff's reliance upon the *Ison* decision[97] to support denial of DuPont's Motion to Dismiss on *forum non conveniens* grounds is misplaced.  Plaintiff's argument ignores the fact that *Ison* involved personal injury claims brought by United Kingdom nationals against DuPont for injuries allegedly sustained as a result of exposure to a *DuPont product* that was researched, developed, and tested at DuPont facilities in and around Wilmington, Delaware.[98]  In that sense, this case is plainly distinguishable from *Ison,* as there is no such DuPont product at issue in this case nor does it implicate a DuPont employee or DuPont facility in Delaware.  In short, this case has no such Delaware connections.

Rocha was an employee at the DASRL-owned Berazategui plant in Argentina where he alleges he was exposed to asbes-

---

Courtroom, the Court is powerless to monitor such conduct.

**97.**   729 A.2d 832.

**98.**   *Id.* at 836.

tos. The plant has been sold by DASRL to a third-party.[99] DASRL still maintains some employment records relevant to this case but many of the records relating to conditions at the plant and the use or presence of asbestos have been transferred to the new owner and are no longer in DASRL's possession.[100] DuPont would therefore not have easy access to records relating to the Berazategui plant that could be critical to its defense. Any records that may still be in DASRL's possession will also have to be translated.

DuPont will face other challenges. Some documents will only be available through the cumbersome and unreliable intervention of the Argentine courts. For example, any witness who could provide information concerning Rocha's exposure to asbestos from sources other than his employer's premises would be in the possession and control of individuals or entities located in Argentina, not in Delaware. Rocha's medical records relating to his diagnosis and treatment are also in the hands of third parties in Argentina.

DuPont concedes that Argentina is a signatory to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), thereby allowing it to conduct discovery in Argentina. It also recognizes, however, that Argentina signed the Hague Convention subject to certain conditions that limit its powers to compel access to witnesses and documents. Specifically, Argentina will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery, a substantial disadvantage to DuPont.[101] This limitation is most certain to affect DuPont adversely because the majority of records relating to the Berazate-

gui facility are now in the possession of the third party that purchased the plant, and DuPont will not likely encounter the same level of voluntary cooperation from co-workers and treatment providers as Plaintiff will.

One indication of the overwhelming hardship DuPont would face if it is forced to litigate these claims in Delaware has already been demonstrated by the parties' difficulties in obtaining expert declarations and affidavits in furtherance of their positions on the Motion to Dismiss. The Court was asked on four separate occasions for extensions of time to submit various filings because of problems encountered in obtaining assistance from Argentine law experts, who were presumably compensated for their services. The difficulty the parties would encounter if they are required to obtain discovery from *uncompensated* persons in Argentina would undoubtedly be substantial.

Considering the types of testimony and witnesses customarily presented in an asbestos case, the Court can logically assume that all or virtually all of the relevant fact witnesses are located in Argentina. Key DASRL personnel that DuPont has specifically identified by name in the Fernandez Declaration are Spanish-speaking residents of Argentina. Plaintiff lives in Argentina. Other surviving members of Rocha's family, who would provide evidence about his lifestyle and the effects of his disease, are in Argentina and not likely to speak English. Plaintiff's co-workers, who have not yet been identified, but will certainly be critical to proof required for Plaintiff's case-in-chief, especially concerning the working conditions at the plant, are Argentine nationals living in Argentina.

---

**99.** Defendant's Opening Brief ("Def.'s Opening Br.") at 5–6.

**100.** *Id.* at 10.

**101.** *See* Def.'s Opening Br. at 43; *See also Candlewood,* 859 A.2d at 995.

Many of them are likely to be retired, elderly, and in poor health. Delaware is not home to *any known* material witnesses, documents, or other items of relevant proof.

### b. *Availability of Compulsory Process for Witnesses*

This factor is directly tied to the first factor concerning access to proof. Defendant points out again that substantially all, if not all, of the witnesses—Rocha's co-workers, supervisors, family members, product nexus witnesses, lifestyle witnesses, treating physicians, employers, and document custodians—are in Argentina. None of these witnesses are known to be subject to compulsory process with this Court and DuPont is not likely to receive the same level of voluntary cooperation as Plaintiff will receive.

Unlike the situation in *Candlewood Timber Group, LLC v. Pan American Energy, LLC*,[102] where the defendant failed to make any particularized showing of hardship, DuPont has identified by name and position at least eight individuals likely to be necessary witnesses.[103] These persons were DASRL employees when Rocha worked at the Berazategui plant and have knowledge of working conditions at the plant, the presence of asbestos there, the policies and procedures at the plant designed to control or minimize asbestos exposure, the plant's level of compliance with Argentine asbestos laws and standards, the training or warnings given to DASRL employees while Rocha was employed there, asbestos air monitoring at the plant, and any medical testing or treatment of exposed employees. None of these former DASRL employees is subject to DuPont's control because DuPont is not now and was never their employer. The fact that

these individuals are elderly and potentially not healthy enough to travel to Delaware is an additional significant concern.

DuPont has in this instance shown with particularity that the location of all third-party critical witnesses imposes a heavy burden upon it to mount its defense through their cooperation and testimony. Under these circumstances, the availability of compulsory process from Delaware courts does contribute substantially to DuPont's hardship.

### c. *A View of the Premises*

DuPont maintains that this factor is significant because inspection of the Berazategui plant and other Argentine premises where Rocha may have been exposed to asbestos will be an essential aspect of the parties' expert industrial hygienist's reports. These experts will likely need to obtain information about the layout of the plant, the use of asbestos there, the location and condition of any remaining asbestos materials still on the premises, the potential for "fiber drift" within the plant, and the proximity of asbestos to the area where Rocha worked. Defendant also points out that if discovery reveals Rocha was exposed to asbestos at premises other than the Berazategui plant, these other areas, undoubtedly located in Argentina, could yield important evidence and its experts may need to tour these premises as well. DuPont submits that experts from the United States would need to travel in excess of 5000 miles for inspection; if they are from Argentina, they in turn would have to come as far to Delaware for trial.

Plaintiff responds that an inspection would be unnecessary since DuPont is "already intimately familiarity (sic) with the Berazategui plant as it has directed and

---

102. 859 A.2d at 995.

103. *See* Fernandez Decl. ¶ 29.

controlled the use of asbestos there for many years." Plaintiff provides no specific factual support for this broad assertion but appears to be referring to DuPont as if it were DASRL, Rocha's former employer and the owner of the plant.

In the Court's judgment, this factor is not implicated because the exposures occurred years ago and it is unlikely that a current inspection of the plant would yield relevant information. Nor would inspections of other possible sources of contamination be helpful in determining conditions that existed previously. Since a view of the premises is rarely necessary in these cases, and since the work sites at issue are not likely to be in the same condition as they were when Rocha worked there, an inspection of the premises would not be of much benefit to either party.

### d. *Applicability of Delaware Law*

Plaintiff recognizes that substantive Delaware law will not apply to this case and that Argentina has the dominant relationship to the parties and the events giving rise to this litigation. Under the Restatement (Second) of Conflict of Laws §§ 6 and 145–46, plaintiff concedes that her claims are governed by Argentine law. This factor does indeed work a significant hardship upon DuPont because it will incur increased expense, inconvenience, and delay.

Decedent Rocha was an Argentine national who resided in Argentina, was allegedly exposed to asbestos while working in Argentina for an Argentine company properly incorporated and capitalized in Argentina, whose injuries occurred in Argentina, and whose illness was diagnosed and treated in Argentina, where he died and where a succession proceeding involving his estate is pending. Plaintiff is not a resident of Delaware, the alleged tort was not committed in Delaware, and Delaware substantive law will not apply to this case. More importantly, Delaware—DuPont's State of incorporation—has no rational connection to the cause of action in this case and is clearly being used as a subterfuge to avoid suing the decedent's actual Argentine employer, who should be named as the defendant herein. In essence, DuPont has been named as a defendant in this litigation not because it employed Rocha and exposed him to asbestos, but as a vehicle to bring this and other future foreign litigation into the United States, and specifically into Delaware.

While Delaware courts are frequently called upon to interpret and apply foreign laws, when those laws are in Spanish and have been enacted in the context of a civil law system originating from the Napoleonic Code, the application of foreign law imposes that much more of a hardship. Even considering the fact that DuPont is a global corporation that is accustomed to litigation on an international level, and irrespective of the importance to Delaware of providing litigants with "a neutral forum to adjudicate commercial disputes against Delaware entities," [104] where the dispute involves foreign law and the parties and conduct are centered in a foreign jurisdiction, this factor definitely does contribute to DuPont's hardship.[105] This test case and the other cases filed by Argentine national plaintiffs are not seeking the expertise of Delaware courts to adjudicate a commercial dispute by an experienced and neutral tribunal. These are toxic tort cases, not complex commercial lawsuits, and the Plaintiffs are taking advantage of this State's extremely lax *forum non conveniens* jurisprudence to target the great-

---

**104.** *Candlewood,* 859 A.2d at 1000.

**105.** *Id.*

great grandparent corporation as the wrongdoer, rather than its indirectly owned Argentine subsidiary, in order to utilize the Delaware courts, without any regard to the hardship to its own corporate citizen.

### e. *The Pendency or Non–Pendency of a Similar Action in Another Jurisdiction*

In the *forum non conveniens* analysis, the absence of a prior pending action in another jurisdiction "is an important, if not controlling, consideration." [106] The Court should be reluctant to exercise its discretion in favor of dismissal when there is no legal action pending elsewhere. DuPont concedes that DASRL records indicate that neither Rocha nor the Administrator of his estate have activated in Argentina the civil claims process against DASRL in connection with Rocha's alleged occupational injury and death.

Argentina does have a well-developed legal system that provides compensation for occupational injuries, including asbestos-related illness. [107] Both parties' legal experts made this clear during the hearing. Legal protection of workers in Argentina is grounded in the Constitution of Argentina, which according to the Argentine Federal Supreme Court of Justice, "ensure[s] that each male and female employee is entitled to preferential protection under the law[.]" [108] Argentina's labor law fulfills that goal. [109]

Claims involving injuries, illnesses, or death that resulted in connection with work performed prior to 1996 are subject to the system that was established in 1915, when Argentina's Federal Congress enacted Law No. 9688. [110] Under Law No. 9688, claimants opt to receive compensation for their work-related injuries or illnesses under two distinct procedures: the system established by Law No. 9688, termed the "special law," or the Civil Code system, known as the "general law." [111] Jurisdiction to hear occupational injury cases under either system lies exclusively with the labor courts of Argentina.

If a plaintiff chooses to proceed under the Civil Code system, he or she is required to prove all elements of liability, including negligence or intentional misconduct on the part of the employer. [112] There is no limit on the amount of compensation and all proven damages are awarded as a lump sum under this general law. If a claimant elects to proceed under the special law, No. 9688, the employer's misconduct or negligence is essentially presumed and compensation is paid to the injured worker based solely on evidence that the occupational injury occurred. [113] Compensation under the special law is paid according to specific rates in lump sum amounts. [114]

In 1995, the Argentine National Congress enacted Law 24.577, known as the Ley de Riesgos del Trabajo ("LRT"), or Occupational Risks Law, that established a new compensation system for occupational injury, illness, or death. [115] That system is

**106.** *States Marine Lines v. Domingo,* 269 A.2d 223, 226 (Del.1970).

**107.** *See generally* Foglia Decl.

**108.** *Id.* ¶ 11.

**109.** *Id.*

**110.** *Id.* ¶¶ 12–14.

**111.** *Id.* ¶ 14.

**112.** *Id.* ¶ 16.

**113.** *Id.*

**114.** *Id.* ¶ 17.

**115.** *Id.* ¶ 20.

similar in many respects to its predecessor compensation system, and to workers' compensation systems in America.[116] Unlike the systems in the United States, however, the LRT also authorizes civil actions against employers.[117] Claimants in Argentina thus have the option of pursuing compensation under the system established by the LRT, or by filing a civil claim against their employers, or both.[118] The benefits payable under both systems include death benefits paid to surviving heirs.[119] In addition, surviving heirs may assert civil claims in connection with an occupationally related death under both systems.[120]

Argentine labor law requires that an employee (or his estate) seeking compensation for an occupational illness or injury must first notify the employer and make a demand for damages, before initiating a civil suit for damages.[121] Rocha's Estate, as of this date, has not notified his employer nor has he made a demand for compensation. Argentine law further conditions the filing of a civil lawsuit upon the requirement that there must first be a civil mediation before a court-appointed mediator. As of the time of the filing of this Complaint, no civil mediation process has been initiated against DASRL or DuPont in Argentina by Martinez or the Rocha Estate in connection with the claims asserted in this lawsuit.

Other former DASRL employees and family members of former DASRL employees have initiated pre-filing demands and mediations against DASRL in Argentina seeking compensation for alleged asbestos-related injuries.[122] None of these individuals have yet formally filed a civil action against DASRL in Argentina but some have sued DuPont in Delaware asserting claims similar to those in this case, but not against DASRL.[123]

In August 2009, an Argentine citizen living in the vicinity of the Berazategui plant filed a lawsuit against DASRL and the plant's current owner, alleging that operations at the plant caused environmental pollution, specifically including asbestos contamination.[124] The suit, which is similar to a class action, seeks damages, an injunction against the polluting activity, and remediation of any plant-caused pollution.

### f. *Other Practical Considerations*

Defendant contends that other practical considerations justify dismissal of this case on *forum non conveniens* grounds. In particular, DuPont emphasizes the fact that DASRL, Rocha's former employer and the former owner of the premises in question, cannot be compelled to appear in this action. Obviously, this factor is also the basis for DuPont's Rule 19 contention that an indispensable party cannot be joined.

In looking at all six of the *Cryo–Maid* factors that must be addressed in any *forum non conveniens* analysis, and their

---

**116.** *Id.* ¶¶ 21–37.

**117.** *Id.* ¶ 22.

**118.** Argentine labor courts have exclusive jurisdiction over these cases and they are frequently utilized by its citizens. In 2009, in excess of 41,000 occupational injury cases were filed in the Argentine labor courts. By the end of 2010, more than 63,000 cases were initiated there.

**119.** Foglia Decl. ¶¶ 48, 61.

**120.** *Id.* ¶ 61.

**121.** Foglia Decl. ¶¶ 65–67; Fernandez Decl. ¶ 12.

**122.** Fernandez Decl. ¶ 13.

**123.** Def.'s Opening Br. at 6.

**124.** Fernandez Decl. ¶¶ 15–16.

applicability to the circumstances of this case, the Court is hard-pressed to distinguish the circumstances here from those in cases like *Candlewood*,[125] *In Re Asbestos (Abou–Antoun)*,[126] or others that have declined to find "overwhelming hardship." To be sure, the practical difficulties inherent in a Delaware Court adjudicating a lawsuit filed by an Argentine national concerning employment conditions at an Argentine plant are not that much more burdensome than the circumstances facing the parties in the *Candlewood* case, where the Delaware Supreme Court reversed the Court of Chancery's finding of "overwhelming hardship." While this Court is mindful of Delaware's jurisprudence that strongly favors deference to a plaintiff's choice of forum, the facts of this case are sufficiently unique that dismissal is justified even on this basis. This is so because the type of hardship facing DuPont if it is forced to litigate this case in Delaware, while at first blush may seem similar to the hardships faced by defendants in prior Delaware cases, is still sufficiently unusual and novel as to make this case the exception. The fact of the matter is that DuPont should not be placed in the position of having to defend this type of lawsuit in Delaware or Argentina or anywhere. DuPont is wrongly identified as Rocha's former employer and as being directly responsible for and in control of the conditions of the Berazategui plant when it was not and never has been. The majority of Plaintiff's claims treat DuPont as though it stood in the shoes of DASRL. In essence, forcing DuPont to defend these claims at all in Delaware—or in any other forum—is plainly wrong under any standard of fairness.

The real reason that DuPont would be subject to overwhelming hardship if forced to litigate this case, and others like it, in Delaware is not because of the problems relating to access to proof or in translating most of the testimony and documents from Spanish to English. It is because it is not DuPont—but DASRL—who employed Rocha and who owned and operated the plant and premises where he was allegedly exposed to asbestos. This circumstance, which is addressed more thoroughly in other sections of this Opinion, is at the very heart of this Court's *forum non conveniens* analysis, and allows this case to fit the category of one of the "rare cases where the drastic remedy of dismissal is warranted." Viewed in this way, the burden of litigating in this forum is so severe as to result in manifest hardship to DuPont because it should not have been named as a defendant in the first place.

Indeed, the Delaware Supreme Court in *Candlewood* even remarked that, had the parties advanced the argument that Argentina was an indispensable party in that case, such that Pan American would be prejudiced without its presence, that circumstance would have been a relevant consideration.[127] Here, the defendant has forcefully and persuasively made that argument under Rule 19 and this Court has decided the question favorably to DuPont. Having already concluded that DASRL is an indispensable party and that dismissal is appropriate on that basis, it is all but impossible to ignore the prejudice to DuPont by being named as the wrong party when considering the *forum non conveniens* issue as well.

It also bears mentioning that Delaware Courts, after considering the *Cryo–Maid* factors, have on occasion found dismissal

---

**125.** 859 A.2d 989.

**126.** 929 A.2d 373.

**127.** *Candlewood,* 859 A.2d at 1000.

to be appropriate.[128] In one such case, which has some similarities to the case at bar, Chancellor Strine (then Vice–Chancellor) gave cogent reasons for dismissal and illustrated why the overwhelming hardship standard is in reality less onerous than the Court's decisions have appeared to suggest.[129]

In *IM2 Merchandising v. Tirex Corp.*, the plaintiff IM2 filed a complaint arising out of the Tirex Companies' (Tirex Corporation and its subsidiary, Tirex Canada) failure to meet their contractual obligations to supply rubber mats through a patented scrap tire recycling system.[130] IM2 had entered into the contract with Tirex in order to meet its own obligations to sell a designated amount of rubber mats to a third-entity, AKRO, pursuant to a contractually agreed upon schedule. Tirex was a Delaware corporation headquartered in Montreal and Tirex Canada was its wholly owned Canadian incorporated subsidiary, also headquartered in Canada. Plaintiff filed the action in the Delaware Court of Chancery, asserting jurisdiction over Tirex Canada on the sole basis that its parent corporation is a Delaware corporation. According to plaintiff, Tirex controlled Tirex Canada, and it argued that its separate corporate identity should therefore be disregarded.

The Court held that it lacked personal jurisdiction over Tirex Canada (an issue not present here but only because plaintiff has chosen not to sue an indispensable party) under 10 *Del. C.* § 3104 because, even if the Court could accept the premise that Tirex Canada had no real separate identity from its Delaware parent, none of the conduct at issue in the case occurred in Delaware.[131] In dismissing the complaint for failure to establish any basis for personal jurisdiction, the Vice Chancellor stated:

> If the plaintiffs' stark theory was accepted, the courts of Delaware would have personal jurisdiction over the non-Delaware subsidiary of a Delaware parent corporation whenever such a subsidiary engages in joint conduct with its Delaware parent *outside of Delaware*. To accept this theory would be to rewrite § 3104 and to pass the limits of this state's authority under the federal constitution.[132]

The Chancery Court then continued to hold that *forum non conveniens* was an alternative basis for dismissal, finding that the defendant had met its burden of establishing overwhelming hardship.[133] It reasoned that Tirex Canada—the direct party to the Agreement—was not subject to personal jurisdiction in Delaware, and the individual directors would not be subject to personal jurisdiction on the contract and tort claims. The court found that procession of the litigation in Delaware would result in "significant and undue costs on the defendants that are unjustified by any countervailing public or legitimate private interest served by conducting this case here. The defendants are being subjected to this inconvenience solely because Tirex is a Delaware corporation even though this fact has little, if any, importance to the plaintiff's claims."[134]

---

**128.** *See IM2 Merch. and Mfg., Inc. v. Tirex Corp.*, 2000 WL 1664168 (Del.Ch. Nov. 2, 2000); *See also Nash v. McDonald's Corp.*, 1997 WL 528036 (Del.Super. Feb. 27, 1997).

**129.** *IM2 Merch.*, 2000 WL 1664168, at *7–11.

**130.** *Id.* at *1–2.

**131.** *Id.* at *3–5.

**132.** *Id.* at *5.

**133.** *Id.* at *7–11.

**134.** *Id.* at *11.

While the Plaintiffs in this test case, and the other asbestos cases filed by Argentine nationals, have not sued DASRL, obviously because they have conceded a lack of jurisdiction, they have instead crafted an elaborate theory to justify filing these actions in this State anyway.

Turning to the public interest factor, the Court cannot ignore the weighty impact upon its docket that this additional caseload would trigger, although recent political circumstances have minimized the burden on the Superior Court. The Court previously alluded to the burden that is placed upon the limited resources of the Superior Court when it is required to adjudicate asbestos cases involving plaintiffs from all fifty states with little or no connection to this forum. It has acknowledged the fact that the citizens of Delaware have to shoulder the expense and strain on its judges and juries by the onslaught of additional foreign cases that have no other connection to Delaware than the mere residency of their parent corporation. Judge Slights expressed his concern in the language quoted earlier from *In re Asbestos Litigation (Abou–Antoun)* and there is no doubt that the additional workload has had a serious impact upon the Court's ability to administer swift and consistent justice. Several months ago, this public interest factor may have been of sufficient concern to have led the Court to conclude that the effect on the Court's docket had become unmanageable. The Delaware Legislature has, however, addressed this problem by increasing the number of Superior Court Judges in New Castle County beginning in January of 2013. Whether the citizens of Delaware would have chosen to remedy the Court's congestion in this manner is irrelevant to the inquiry here. This Court is at least more comfortable in concluding that the specter of additional filings, from a Court resource or docket management perspective, does not enter into the Court's scrutiny at this time.

Ultimately, the Court must approach the *forum non conveniens* analysis in this case with due regard to the particular and unique facts that make this and the other similar Argentine cases entirely inappropriate to be litigated and adjudicated in Delaware. Aside from the obvious difficulties inherent in requiring a Court in Delaware to apply the laws of a foreign country to a cause of action filed by a foreign plaintiff, concerning employment conditions at a textile plant in Argentina that is owned and operated by an Argentine company, the Court cannot ignore the fact that these cases have been filed in Delaware only through distortion and manipulation of the typical parent-subsidiary corporate relationship, and only because these Plaintiffs have made extraordinary efforts to attribute conduct and actions to the parent corporation that were strictly the acts of its Argentine subsidiary. There is in this case, and the others like it, no local interest. There is no local controversy, and "home" is not Delaware to Plaintiff, Plaintiff's decedent, or the relevant employer DASRL. Even if the Delaware Supreme Court were to approve of the use of a company's Delaware incorporation, without more, as an appropriate reason to deny a defendant's *forum non conveniens* application for dismissal, it is not likely to countenance the fiction contrived by Plaintiff here—that DuPont, not DASRL, was in control of the Berazategui plant in Argentina—solely as a basis to use Delaware as a forum for these tort disputes.

Nor should this Court be willing to accept Plaintiff's elaborate attempts to attribute to DuPont an obscure and plainly inapplicable theory of liability, i.e. direct participant liability, to justify filing cases in this state. These are non-commercial and non-corporate garden-variety toxic

tort disputes between Argentine employees and their Argentine employers for which the Delaware courts should not be automatically available to anyone who has ever sustained harm anywhere across the globe.

Finally, the Court is fully aware of the authority upon which Plaintiff relies to retain jurisdiction over these foreign national filings and the similarities in some of the fact patterns. Yet, it is not persuaded that these cases must inform the Court's decision here. This is so because neither *Ison*, *Candlewood*, nor *Lluerma* involved any effort by a plaintiff to litigate a case or cases in Delaware by distorting the relationship of the parties such that the defendant was wrongly sued by virtue of its corporate parent status.

The *Lluerma* case, for example, involved Spanish nationals allegedly exposed to asbestos in Spain. The plaintiffs in *Lluerma* worked exclusively on American warships or in shipyards where the ships were flying the American flag. Since ships flying the American flag are considered to be American soil, the Court in that case was uncertain whether Spain would even have jurisdiction over activities occurring on American warships while docked in Spain.

Even in the *Candlewood* decision, where the Delaware Supreme Court reversed the Court of Chancery's dismissal of the action on *forum non conveniens* grounds because the trial court's analysis gave undue consideration to the relative interests of Argentina in contrast to Delaware, the Court recognized the importance of naming the proper parties. The Court there rejected any determination based on whether an alternate forum would be more convenient, finding that such an analysis lowered the applicable standard and minimized "a significant Delaware interest in the lawsuit, which is to make available to litigants a neutral forum to adjudicate commercial disputes against Delaware entities even where the dispute involves foreign law and the parties and the conduct are centered in a foreign jurisdiction." Yet, it specifically acknowledged that, had the Plaintiff made the argument that it would have been prejudiced if the case proceeded in Delaware *without the Argentine governmental entities as indispensable parties,* such a position—had it been asserted—would have constituted an independent basis for dismissal of the action.

In this instance, DASRL is indeed an indispensable party and this Court has so found in a prior section of this Opinion. As in *Candlewood,* such a finding provides a related yet independent basis to dismiss this case.

Thus, when all is said and done, even the seemingly insurmountable burden of proving "overwhelming hardship" to justify dismissal in a case involving a nominal Delaware corporation can in fact be met when the circumstances are sufficiently unique as they are here. This is so because the type of hardship facing DuPont if it is forced to litigate this case (and others like it) in Delaware is sufficiently unusual to make it the exception. The fact of the matter is that DuPont should not be placed in the position of having to defend this type of lawsuit in Delaware, or in Argentina, or anywhere. DuPont has been wrongly identified as Rocha's former employer, and is being charged with direct responsibility for, and control of, the conditions at the Berazategui textile plant, when it was not and never has been in such a position. The bulk of Plaintiff's claims treat DuPont as though it stood in the shoes of DASRL. Forcing DuPont to defend these claims at all—in Delaware or in any other forum—is plainly wrong under any standard of fairness. Viewed in this

context, the burden of litigating in this forum is so severe as to result in overwhelming hardship to DuPont.

### VI. *Conclusion*

For all of the foregoing reasons, DuPont's Motion to Dismiss is GRANTED.

**IT IS SO ORDERED.**

Ya me despido.